## UNITED MINE WORKERS OF AMERICA ET AL. *v.* CORONADO COAL COMPANY ET AL.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 31. Argued October 15, 1920; restored to docket for reargument January 3, 1922; reargued March 22, 23, 1922.—Decided June 5, 1922.

1. In view of the Conformity Act and the law of Arkansas respecting consolidation of causes, *held,* that the District Court did not abuse its discretion in permitting several allied corporations to be joined as plaintiffs in an action prosecuted by their receiver to recover triple damages under § 7 of the Sherman Act for the destruction of their properties and business committed in an alleged conspiracy to restrain interstate commerce. P. 382.

2. Unincorporated labor unions, such as the United Mine Workers of America, and its district and local branches, impleaded in this case, recognized as distinct entities by numerous acts of Congress, as well as by the laws and decisions of many States, are suable as such in the federal courts upon process served on their principal officers, for the torts committed by them in strikes; and their strike-funds are subject to execution. P. 385.

3. Such associations are included by § 7 of the Sherman Act, permitting actions for damages resulting from conspiracies in restraint of interstate commerce to be brought against " corporations and associations existing under or authorized by the laws of either the United States'" or the laws of any Territory, State or foreign country. P. 392.

4. Where the constitution of a general association of workmen, organized for the declared purpose of improving their wages and working conditions through strikes and other means, and subdivided into district and local unions, through which its treasury was supplied, authorized the several district organizations to order local strikes within their respective districts, but upon their own responsibility and without financial support from the general body unless sanctioned by its governing board, and a local strike in which serious trespasses were committed was called by a district without such sanction, but in accordance with its own constitution, and conducted by it at its own expense, *held,* that the general association was not responsible, upon principles of agency, even though it had power to discipline the district and take over the strike at its own expense, and that liability on its part and that of its officers could not be sustained without substantial evidence of their participation in or ratification of the torts committed. P. 393.

5. The overwhelming weight of evidence in this case establishes that the defendant district union and its officers, with other individual defendants, participated in a plot unlawfully to deprive the plaintiffs of their employees by intimidation and violence, and in its execution destroyed the plaintiffs' properties. P. 396.

6. Where the constitution of a district organization of several local labor unions authorizes the district officers to order a local strike, the district is responsible for injuries unlawfully inflicted in a strike so ordered, and its strike funds may be subjected to a resulting judgment. P. 403.

7. The mining of coal is not interstate commerce; and a conspiracy to obstruct mining at particular mines, though it may prevent coal

from going into interstate commerce, is not a conspiracy to restrain that commerce, within the Sherman Act, unless an intention to restrain it be proven or unless so direct and substantial an effect upon it necessarily result from the obstruction to mining that such intention must in reason be inferred. P. 410.

8. Evidence that a union of coal miners belonged to a general association which, as an incident of its object to promote wages, etc., had a general policy to unionize coal mines by strikes, etc., and thus discourage competition of open-shop against union mines in interstate commerce, *held* not sufficient to prove that a conspiracy of the lesser organization and its members, accompanied by a local strike, to prevent the employment of non-union miners and the mining of coal at particular mines, was a conspiracy to restrain interstate commerce in violation of the Sherman Act, where the strike and its lawless activities were the affair of the conspirators, explained by local motives, and the normal output of the mines was not enough to have a substantial effect on prices and competition in interstate commerce from which a motive to assist the general policy might be inferred. Pp. 403, 412.

258 Fed. 829, reversed.

THIS is a writ of error brought under § 241 of the Judicial Code, to review a judgment of the Circuit Court of Appeals of the Eighth Circuit. That court on a writ of error had affirmed the judgment of the District Court for the Western District of Arkansas, in favor of the plaintiffs, with some modification, and that judgment thus affirmed is here for review.

The plaintiffs in the District Court were the receivers of the Bache-Denman Coal Company, and eight other corporations in each of which the first-named company owned a controlling amount of stock. They were closely interrelated in corporate organization and in the physical location of their coal mines. These had been operated for some years as a unit under one set of officers in the Prairie Creek Valley in Sebastian County, Arkansas. In July, 1914, the District Court for the Western District of Arkansas appointed a receiver for all of the nine companies by a single decree. The receiver then appointed

was Franklin Bache, whose successors as such are defendants in error here.

The defendants in the court below were the United Mine Workers of America, and its officers, District 21 of the United Mine Workers of America, and its officers, 27 local unions in District No. 21, and their officers, and 65 individuals, mostly members of one union or another, but including some persons not members, all of whom were charged in the complaint with having entered into a conspiracy to restrain and monopolize interstate commerce, in violation of the first and second sections of the Anti-Trust Act, and with having, in the course of that conspiracy, and for the purpose of consummating it, destroyed the plaintiff's properties. Treble damages for this and an attorney's fee were asked under the seventh section of the act.

The original complaint was filed in September, 1914, about six weeks after the destruction of the property. It was demurred to, and the District Court sustained the demurrer. This was carried to the Court of Appeals on error, and the ruling of the District Court was reversed. *Dowd* v. *United Mine Workers,* 235 Fed. 1. The case then came to trial on the third amended complaint and answers of the defendants. The trial resulted in a verdict of $200,000 for the plaintiffs, which was trebled by the court, and to which was added a counsel fee of $25,000, and interest to the amount of $120,600, from July 17, 1914, the date of the destruction of the property, to November 22, 1917, the date upon which judgment was entered. The verdict did not separate the amount found between the companies. On a writ of error from the Court of Appeals, the case was reversed as to the interest, but in other respects the judgment was affirmed. 258 Fed. 829. The defendants, the International Union and District No. 21, have given a supersedeas bond to meet the judgment if it is affirmed as against both or either of them.

The third amended complaint avers that of the nine companies, of which the plaintiff was receiver, and for which he was bringing his suit, five were operating companies engaged in mining coal and shipping it in interstate commerce, employing in all about 870 men, and mining an annual product when working to their capacity valued at $465,000, of which 75 per cent. was sold and shipped to customers outside of the State. Of the five operating companies, one was under contract to operate the properties of two of the others, and four non-operating companies were each financially interested in one or more of the operating companies either by lease, by contract, or by the ownership of all or a majority of their stock. The defendant, the United Mine Workers of America, is alleged to be an unincorporated association of mine workers, governed by a constitution, with a membership exceeding 400,000, subdivided into thirty districts and numerous local unions. These subordinate districts and unions are subject to the constitution and by-laws not only of the International Union, but also to constitutions of their own.

The complaint avers that the United Mine Workers divide all coal mines into two classes, union or organized mines operating under a contract with the union to employ only union miners, and open shop or non-union mines, which refuse to make such a contract; that owing to the unreasonable restrictions and regulations imposed by the union on organized mines, the cost of production of union coal is unnecessarily enhanced so as to prevent its successful competition in the markets of the country with non-union coal; that the object of the conspiracy of the United Mine Workers and the union operators acting with them is the protection of the union-mined coal by the prevention and restraint of all interstate trade and competition in the products of non-union mines. The complaint enumerates twenty-three States in which coal

mining is conducted, and alleges that the coal mined in each comes into competition in interstate commerce, directly or indirectly, with that mined in Illinois, Kentucky, Alabama, New Mexico, Colorado, Kansas, Oklahoma and Arkansas, in the markets of Louisiana, Texas, Oklahoma, Nebraska, Kansas, Missouri, Iowa and Minnesota, where, but for the defendants' unlawful interference, plaintiffs would have been engaged in trade in 1914; that the bituminous mines of the greater part of the above territory are union mines, the principal exceptions being Alabama, West Virginia, parts of Pennsylvania and Colorado, which the defendant has thus far been unable to organize.

The complaint further avers that, early in 1914, the plaintiff companies decided that the operating companies should go on a non-union or open shop basis. Two of them, the Prairie Creek Coal Mining Company and the Mammoth Vein Coal Company, closed down and discontinued as union mines, preparatory to reopening as open shop mines in April. They were to be operated under a new contract by the Mammoth Vein Coal Mining Company. Another of the companies, the Hartford Coal Company, which had not been in operation, planned to start as an open shop mine as soon as convenient in the summer of 1914. The fifth, the Coronado Coal Company, continued operating with the union until April 18, 1914, when its employees struck because of its unity of interest with the other mines of the plaintiffs. The plaintiffs say that in April, 1914, the defendants and those acting in conjunction with them, in furtherance of the general conspiracy, already described, to drive non-union coal out of interstate commerce, and thus to protect union operators from non-union competition, drove and frightened away the plaintiffs' employees including those directly engaged in shipping coal to other States, prevented the plaintiffs from employing other men, destroyed the structures and facilities for mining, loading and shipping coal, and the

cars of interstate carriers waiting to be loaded, as well as those already loaded with coal in and for interstate shipment, and prevented plaintiffs from engaging in or continuing to engage in interstate commerce. The complaint alleges that the destruction to the property and business amounted to the sum-of $740,000, and asks· judgment for three times that amount or $2,220,000. Certain of the funds of the United Mine Workers in Arkansas were attached. The defendants, the United Mine Workers of America, District No. 21, and each local union and each individual defendant filed a separate answer. The answers deny all the averments of the complaint. The trial began on October 24, 1917, and a verdict and judgment were entered on November 22, following. ·The evidence is very voluminous, covering more than 3,000 printed pages.

Mr. *William A. Glasgow, Jr.*, with whom Mr. *Charles E. Hughes*, Mr. *Henry Warrum*, Mr. *G. L. Grant* and Mr. *Allen S. Hubbard* were on the briefs, for plaintiffs in error.[1]

I. The judgment of the Circuit Court of Appeals was reviewable here. Jud. Code, § 128.

II. The court below erred in holding that the action could be brought, process had and judgment recovered against unincorporated labor unions.

A group of individuals is not liable to be sued in tort unless it constitutes a person in law.

It is clearly established that the members of an unincorporated association may not be sued in the name of the association. *Oxley Stave Co.* v. *Coopers International Union*, 72 Fed. 695; *Hopkins* v. *Oxley Stave Co.*, 83 Fed. 912; *American Steel Co.* v. *Wire Drawers Union*, 90 Fed. 598; *Dowd* v. *United Mine Workers of America*, 235 Fed. 1.

---

[1] At the former hearing the case was argued by. Mr. *Charles E. Hughes*, on behalf of the plaintiffs in error.

The very essence of the action of the State in creating a corporation is that it brings into being a legal entity which can be treated as such, in suing and being sued. It is well settled that it must appear that an association, if it is not a corporation, has received by appropriate legislation a legal status before it, or its members, may be sued in the name of the group.

It is apparent from §§ 7 and 8 of the Sherman Act that Congress did not attempt to provide a new remedy against all unincorporated groups or associations. It made no designation of officers or agents upon whom process might be served. It made no provision as to the effect of the judgment to be recovered, or limiting execution thereon to common property or property jointly held through group or association.

This is a penal statute; it may be enforced by criminal prosecution; and treble damages may be awarded under it. It is wholly inadmissible to give it a breadth which would reach, contrary to its terms and to the principles of the common law, every unincorporated association.

Congress defined who were to be liable. They were to be " persons " who shall make any such contract or engage in any such combination or conspiracy (§§ 2, 3). The term " person," has a well-established legal significance and an unincorporated group is not, as such, a " person." And the extent to which any association or group might be held liable as a " person " under the Sherman Act was explicitly defined in § 8. Congress included " corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." It was not the privilege of the court below to go beyond these terms in the search of any supposed policy. The question was not, who should be exempted from liability, but who were made liable. The policy of the statute must be found in its terms. *United*

*States* v. *Wiltberger,* 5 Wheat. 76, 96; *Hadden* v. *The Collector,* 5 Wall. 107, 111–112.

It may be said that in some cases associations have been joined with the individuals and corporations comprising the association in suits under the Sherman Act, but these have been equity suits for injunction in which the individuals and corporations which were members of the association were parties. In *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, also an injunction suit, it does not appear that the point was raised.

Had Congress stopped with the words "corporations and associations," the rule *noscitur a sociis* would apply, and the term "associations" would be taken to mean such organizations as those to which legislation had given a legal status as quasi corporations. But the added words, saying explicitly what sort of associations were meant, relieve the question of doubt. *Eliot* v. *Freeman,* 220 U. S. 178.

The expression "existing under or authorized by the laws" of the United States or of any State should appropriately be taken to refer to statutes. Abbott's Law Dictionary, Title "Law," subdiv. 3; *Swift* v. *Tyson,* 16 Pet. 1, 18. Otherwise, the clause would mean that associations that were unlawful were not within the purview of the section. Moreover, if Congress had intended to refer simply to unincorporated associations, without reference to any legislation which had given them the status of persons, that is to any lawful association whatever, it would not have added the last clause. The construction for which the plaintiffs contend makes the words "existing under or authorized by the laws of either the United States," etc., surplusage.

The provision of § 7, that the action shall be brought "in the district in which the defendant resides or is found," is appropriate if the word "association" is used

as defined in § 8, but is inapposite if it is sought to give it the breadth for which the plaintiffs contend.

Whatever may be said of the *Taff Vale Case,* [1901] A. C. 426, as a matter of statutory construction (and it may here be noted that the effect of the decision was swept away by Parliament five years later, 6 Edw. VII, c. 47, § 4, subsec. 1; see *Vacher & Sons, Limited,* v. *London Society of Compositors,* [1913] A. C. 107), it certainly forms no precedent for a construction of §§ 7 and 8 of the Sherman Act. By that act, Congress did not attempt to give labor unions a status which they did not have before.

No one doubts that the Sherman Act applies to the members of a labor union as well as to business men, but the act has its appropriate application when actions are brought against the persons guilty of combination in accordance with the familiar principles of the common law.

III. Recovery against the United Mine Workers of America was entirely unwarranted by the evidence.

(*a*) A labor union, as such, is not within the Sherman Act. The fact that a labor union has a membership throughout the country does not bring it within the act. *Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418; Clayton Act, §. 6.

The miners were thus entitled to organize, and through organization to seek the amelioration of the condition of miners in the various mines throughout the country and to pursue this end by all lawful means.

(*b*) The constitution of the United Mine Workers of America is the agreement of membership. It fixes the terms upon which these miners unite and contribute to the funds which the judgment below turns over to the plaintiffs. The constitution and the objects of the association are entirely lawful. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, 253, 267.

The constitution deals with strikes and classifies them as follows: (1) Where the major portion of the members of a district are to be involved; (2) where the strike is in an unorganized field; (3) where the strike is in an organized field, but is to be financed by the International Union; and (4) where the strike is in an organized field and is not to be financed by the International Union. In the first three cases, the sanction of an international convention or of the international executive board must be procured before a strike may be called. In the last case, the district is permitted to call a strike upon its own responsibility.

It is urged by the plaintiffs that the district, and the members of local unions, in the case of a local strike conducted on their own responsibility and without the sanction of the International Association, are the agents of the Association in calling and conducting the strike. But this is simply to ignore the definitive words of the section above quoted, "on their own responsibility." This is the formal and definitive agreement of all the members of the Association with each other. It is an agreement to the effect that if some of the members locally go on strike on their own account, such a strike shall be on their own account, and that the other members shall not be in any way responsible therefor. Responsibility must rest upon facts of authorization and representation, which here are absolutely negatived. The insertion of this provision had a very clear purpose, for the context shows that the important point of a financial support for a district engaged in a strike was involved, and it was made clear that the International Association could not be called upon for any support for a strike unless it was sanctioned, and that if a district ordered a strike, without the authority of the Association, the latter assumed no responsibility of any sort with respect to it. *Denaby & Cadeby Main Collieries* v. *Yorkshire Miners' Association.* [1906] A. C. 384.

Further, under the constitution of the Association, the president had no authority to sanction a strike without the action of the international executive board.

The Association did not have control over the district where the district went ahead on its own responsibility. By the express provision of the constitution, to that extent there was local autonomy. The control which the Association was entitled to exert was control according to the terms of the constitution of the Association, and not otherwise.

It is wholly untenable to say that, when a local union acts on its own responsibility and the Association does not sanction its action, the Association must resort to expulsion to save itself from liability.

(c) The United Mine Workers of America did not authorize, participate in, or ratify the alleged acts committed in Arkansas by reason of which the recovery of damages was allowed. The disturbances were local, arising from local grievances, caused entirely by local conditions.

In any view, the controlling fact is that no board or officer of the International Association participated in any of these acts or authorized any of them at any of the mines. If a distinction between a " lock-out " and a " strike " be ignored, and it be assumed that there were strikes at all the mines in question, still none of these strikes, and none of the acts in question, was authorized or sanctioned by the Association. Moreover, nothing is better settled than that a strike is not in itself unlawful, and the question here is the responsibility for particular acts that were not any necessary part of a strike.

It is not enough to show that some members of the union committed acts of violence. Even in cases of conspiracy, where an illegal combination is found to exist, members are not liable for acts not within the scope of

the illegal agreement. *Commonwealth* v. *Campbell,* 7
Allen, 541, 544; *Pettibone* v. *United States,* 148 U. S.
197, 207. And certainly there is no principle better es-
tablished than that, where a number of persons combine
to achieve a lawful end by lawful means, and certain per-
sons of the association combine to achieve that same end
by unlawful means, the whole association is not responsi-
ble for the unlawful acts of the few members. *Common-
wealth* v. *Hunt,* 4 Metc. 111, 129; *United States* v. *Kane,*
23 Fed. 748; *Lawlor* v. *Loewe,* 187 Fed. 522; 223 U. S.
729; 235 U. S. 534, 535; *Eagle Glass & Mfg. Co.* v. *Rowe,*
245 U. S. 275; 219 Fed. 719, 720, 721. Certainly, the
law does not require less proof to connect individual
members of a union with the tortious acts of other mem-
bers in this action for triple damages under the Sherman
Act than it does in an application for an injunction on
ordinary equitable grounds, such as was considered in
the *Eagle Glass Co. Case.*

The liability of the International Association should be
tested by the question whether an individual miner, a
member of the Association living in Pennsylvania, could
be sent to jail for violation of the Anti-Trust Act because
of the conduct of these Arkansas miners and his alleged
connection with them. The gist of the action under § 7 is
the alleged combination in restraint of trade. The indi-
vidual miners, members of the International Union, are
the persons who, it is claimed, constitute this combination.
Unless these miners located in Pennsylvania, Ohio, Indi-
ana and other States, as well as in Arkansas, have con-
federated together to restrain by unlawful means inter-
state trade and commerce, there is no basis for the
judgment against the Association. *Patterson* v. *United
States,* 222 Fed. 599. Surely, a person may not be con-
victed of participation in a criminal conspiracy because
he fails to set himself up as a court of justice to try and
discipline persons who are claimed to have violated the
criminal law.

(*d*) Notwithstanding the provisions of the constitution of the International Association, and notwithstanding that it did not authorize, participate in or sanction either the " strike " or the alleged wrongful acts in Arkansas, liability has been predicated on the view that these acts in Arkansas were committed in carrying out the " aims, objects and purposes " of the national organization. Such a view, we submit, is wholly without warrant and is based upon a misconstruction of the policy of the Association.

IV. The verdict is also unsustainable with respect to District No. 21. Entirely apart from the relation of the District to the strike, the officers of the District were without authority to bind the membership of the district organization, the miners of Texas, Oklahoma and Arkansas, so as to impose liability for the alleged illegal acts in which the members had not participated. And the same is true with respect to the local unions so far as their members had not authorized the acts in question.

V. The facts proved at the trial did not justify a recovery against any of the defendants under the Sherman Act. There was no proof of any combination or conspiracy in restraint of interstate commerce.

This action is to recover damages for particular acts alleged to have been committed by certain individuals in Arkansas. What were these acts? Without now going into the questions which were contested at the trial, with respect to provocation and incitement, the most that can be said from the standpoint of the plaintiffs is that certain individuals committed trespasses and destroyed property, thus inflicting the damage sought to be recovered.

We start then with these individuals. Certainly, it cannot be said that their conduct, separately considered, had any such direct relation to interstate commerce as would justify an action against them under the Sherman

Act. The fact that a factory or a mine produces commodities, which are the subject of interstate trade, of course does not make the destruction of the factory or mine a matter of federal cognizance under the Commerce Clause.

Again, if it were assumed that several persons combined to impair or destroy a factory or mine at which commodities were produced which would go in interstate commerce, still that fact alone would not support a finding of a combination or conspiracy in restraint of interstate commerce. The fundamental question, recognized as of vital importance in the exercise of the important jurisdiction of this court in defining the scope of the Commerce Clause and the validity and application of legislation under that clause, is whether the conduct sought to be regulated has direct or indirect relation to interstate commerce. Were it not for this test of direct or indirect relation, the court would be at sea without chart or compass. If whatever may be deemed to have an indirect or consequential relation to, or effect upon, interstate commerce were regarded as being within the Commerce Clause, it would be difficult to find any activity of importance in any community that fell without it. Such a construction of the Constitution would destroy the Constitution itself. Difficult as may be the application of the test in certain cases, there is no difficulty in apprehending the test itself. To hold that merely because a mine produces coal, which if produced and sold would enter into interstate commerce, an injury to the mine is interference with interstate commerce cognizable by Congress, is to ignore the distinction which underlies countless decisions of this court and to establish a centralized power in the Federal Government which would know no limitation with respect to all the activities which precede interstate commerce,—activities not only relating to production but to all the manifold affairs which affect the productive capacity of human beings.

*Hopkins* v. *United States,* 171 U. S. 578, 592; *United States* v. *Patten,* 187 Fed. 664, 671; 226 U. S. 525, 542.

The mining of coal is not interstate commerce and a mine is not an instrumentality of interstate commerce, *Kidd* v. *Pearson,* 128 U. S. 1, 21; and the fact that an article was manufactured for export to another State does not make it an article of interstate commerce within the meaning of the Constitution. *Coe* v. *Errol,* 116 U. S. 517.

And the fact that a commodity might come into interstate commerce does not preclude the exercise of the police power of the State so as to prevent its manufacture, if such prevertion is otherwise within the police power of the State. *Kidd* v. *Pearson, supra.*

An injury to a miner in mining coal is not an injury to interstate commerce and is not an injury to an instrumentality of interstate commerce. *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439; *Hammer* v. *Dagenhart,* 247 U. S. 251, 272.

The thought of the individuals who committed the alleged wrongs, if the testimony introduced by the plaintiffs be accepted, was on the mining and the men who were mining and the conditions of work. It was not upon commerce, but on production. If it be assumed that the purpose was to prevent certain men, non-union men, from working, it was still the prevention of work by these men that they had in mind.

Of course, a finding of conspiracy or combination in restraint of interstate commerce, that being the gist of the action, must be supported by the sort of proof that will sustain a criminal prosecution or an action for treble damages. The conspiracy must be established as a fact over and above any and all evidence of injury to property used in production, or of intent to injure such property, or of combination for that purpose.

The objects of the International Association have no direct relation to interstate commerce; and the fact that

they relate to employment in production in many mines, or to mines in several States, does not alter their essential character. Their legal and constitutional aspect is the same with respect to work in mines in a dozen States, as it is with respect to work in one mine.

It may be said that the constitution of the Association contemplated strikes. But a strike, as such, in a mine, or in a factory, while it may affect production, has no direct relation to interstate commerce. The constitution of the Association, in its provisions relating to strikes, said nothing of boycotts or of anything having direct relation to trade, interstate or otherwise.

Again, the effort to " unionize " does not imply any conduct having direct relation to interstate commerce. The number of instances involving the same policy does not affect the nature of that policy in relation to interstate commerce, and it is necessary to find something more than the mere policy of " unionizing," or of strikes, or of refusal to work with non-union men, or of refusal to mine coal with non-union men, in order to create a combination or conspiracy in restraint of interstate commerce.

The prevention of the mining of coal by non-union men may, of course, be brought about by " unionizing " a mine. This can be accomplished by entirely lawful means, and illegal purpose or illegality of means is not to be presupposed but requires proof. Apart from this, the prevention of mining coal by non-union men, as such, is not an interference with interstate commerce in the proper sense. When the intent and purpose have relation simply to hours, wages and conditions of production, the agreement or combination relates to production and not to interstate commerce, the effect of the latter, if it exists, being merely incidental.

The mere act of conference between operators and miners, and the agreements for wages, etc., which were reached, we must assume to be unobjectionable. There

has been no finding that the operators and the miners entered into a conspiracy in restraint of interstate commerce.

Statements in speeches made at these conferences have been introduced for the purpose of showing that there was a conspiracy or combination, in which the International Association was engaged, in restraint of interstate commerce. This sort of evidence is a very frail reliance when it is sought to hold hundreds of thousands of members of an association, with expressed purposes which are entirely lawful and laudable, as being guilty of a violation of the criminal law. It is true that the individuals at these conferences were representatives or delegates, but it does not follow that all the members were bound by anything a delegate in the heat of controversy might say. But if these utterances are examined, they fall far short of showing the intent and purposes which are here ascribed.

There is nothing to show that the local unions and District No. 21 had engaged in any combination or conspiracy in restraint of interstate commerce. The reasoning that we have employed above also applies to these associations.

VI. The District Court erred in its instructions to the jury.

VII. There was a misjoinder of plaintiffs and of their causes of action, the complaint failing to show any community of interest in the plaintiffs or any joint cause of action.

To entitle plaintiffs to join in an action for damages they must have a joint legal interest in the property affected and in the damages sought to be recovered. 1 Chitty's Pleadings, p. 64; *Oliver* v. *Alexander,* 6 Pet. 143, 145; *Yeaton* v. *Lenox,* 8 Pet. 123; *Bertrand* v. *Byrd,* 5 Ark. 651; *Harris* v. *Preston,* 10 Ark. 201. This rule is fundamental and prevails in States, of which Arkansas is

one, that have adopted the reform procedure. Pomeroy, Code Remedies, § 231; Kirby's Ark. Digest, § 6005; *Johnson* v. *Ditlinger,* 140 Ark. 509.

It is said, however, that if separate actions had been brought, they could have been consolidated under the Arkansas Consolidation Act. Kirby's Digest, § 6083–a. This is a plain copy of the federal statute of consolidation. Rev. Stats., § 921; Jud. Code, § 1. Where a State adopts a statute that has been interpreted in other jurisdictions, it presumptively adopts the interpretation which has there been accorded it. This would seem to be the more imperative where the statute adopted has operated and determined the practice in courts having concurrent jurisdiction with the courts of the adopting State. The federal statute has been uniformly interpreted by the federal courts as leaving the right to order consolidation wholly to the discretion of the court. *Mutual Life Insurance Co.* v. *Hillmon,* 145 U. S. 285, 292; *Toledo &c. R. R. Co.* v. *Continental Trust Co.,* 95 Fed. 497, 506. In construing the Arkansas act, the courts of that State, however, have declared themselves untrammeled by this interpretation of this court. *Fidelity-Phenix Insurance Co.* v. *Friedman,* 117 Ark. 71. The right exercised by the state court to indulge in new experiments in procedure should not be superior to the right of the federal court to follow its own long-established practice. Under the Federal Conformity Act, conformance to the practice adopted by the Arkansas courts is neither required nor justified on the part of the federal courts. 2 Bates, Federal Procedure and Law, p. 680, § 971; *Mutual Life Insurance Co.* v. *Hillmon, supra; Mexican Central Ry. Co.* v. *Pinkney,* 149 U. S. 194; *Shepard* v. *Adams,* 168 U. S. 618; *Hanks Dental Association* v. *International Tooth Crown Co.,* 194 U. S. 303, 310.

The alleged Arkansas rule and the right asserted by plaintiffs is furthermore in antagonism to the doctrine

that, after consolidation, the causes of action remain distinct and require separate verdicts and judgments. *Mutual Life Insurance Co.* v. *Hillmon,* 145 U. S. 285. Even the practice in Arkansas does not authorize this verdict. *Southern Anthracite Coal Co.* v. *Thrasher,* 93 Ark. 140, 143; *Lumiansky* v. *Tessier,* 213 Mass. 182, 188.

Moreover, the Federal Anti-Trust Acts provide a special proceeding, lying only within the jurisdiction of the federal courts, and, to the extent they indicate the practice to be followed in actions to recover damages, must govern regardless of procedure in the state courts. Section 7 of the Sherman Act provides that " any person who shall be injured in his business or property . . . may sue therefor." The clear and necessary implication is that each person must bring his suit alone. See 21 Cong. Rec., 3149, 3151.

No authority in law has been offered or can be found for the proposition that because receivers were appointed for these nine corporations in one suit and in one decree, their separate causes of action thereby became joint. 23 Am. & Eng. Encyc. of Law, 1073; High on Receivers, 4th ed., § 204.

Finally, even upon the assumption that divers plaintiffs with separate demands under the Sherman Act may join in suing, it appears from the complaint that the five non-operating companies are wholly without rights of action.

The Arkansas decisions merely hold that where a trial court has erroneously failed to grant a defendant's motion to strike out because of a misjoinder, the Supreme Court will not reverse the judgment, if it appears that the separate causes, if they had been brought separately, could have been consolidated. Manifestly, the Conformity Act does not require a federal court to follow the decisions of the Arkansas courts as to what they conceive to be harmless error or similar questions.

VIII. The orders requiring the unincorporated labor unions and their officers to produce their books and documents, for the purpose of proving the officers and members of these unions guilty of the alleged criminal conspiracy, were violative of their rights under the Fourth and Fifth Amendments. *American Banana Co.* v. *United Fruit Co.*, 153 Fed. 943. The defendant unions not being incorporated, *Hale* v. *Henkel*, 201 U. S. 43, has no application.

*Mr. Henry S. Drinker, Jr.,* and *Mr. James B. McDonough,* with whom *Mr. Roger B. Hull* was on the brief, for defendants in error.

The crucial question is whether a labor union is liable, under the Sherman Anti-Trust Act, for damages inflicted by its duly constituted officers and representatives, in the furtherance of its collective aims and purposes, in the course of a combination and conspiracy in restraint of interstate commerce.

Although the union has a membership of upwards of 400,000 men, bound together by a constitution to carry out its objects, which objects constitute the sole business and livelihood of its members; although it has an organization as highly centralized as it would be possible to create, with innumerable district and local branches chartered and created by the main organization to carry on its activities and do its bidding and subject to discipline or annulment by it for refusal so to do; although it has vast associate funds delegated to its officers to be used in carrying on its business, and which, as in the present case, may be employed solely by unlawful means and with an unlawful purpose to crush those who stand in its way; nevertheless, it is claimed, these same vast funds cannot be made to pay for the damage which they have caused, solely because the union has not chosen to incorporate.

In case of an association of this type, what the parties have actually done and what powers they have actually

assumed and exercised in the management of the organization are even more important than what their constitution says.

I. The unions were subject to be sued as associations, under the Sherman Act.

*Loewe* v. *Lawlor,* 208 U. S. 274, has settled the question that, when Congress forbade every combination or conspiracy in restraint of interstate commerce, it meant "every" such combination.

When Congress expressly included in its definition of the "person" against whom suit might be brought, corporations or associations existing under or authorized by state or federal laws, it obviously intended to make the test of liability not the volition of the parties liable or the ingenuity of the attorneys who organized them in a particular form of association, but the actual existence of such an association in a form sufficiently tangible to commit a violation of this statute in its associate capacity.

So far as we know, no question has ever been raised of the propriety of joining, as a party defendant to such suits by the United States, any unincorporated association which itself constituted the combination violating the law. Indeed, the decisions of this court in two of the leading Anti-Trust cases bear the names of unincorporated associations,—*United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, and *United States* v. *Joint Traffic Association,* 171 U. S. 505. One of the Circuit Court decisions, cited with approval by this court in the *Danbury Hatters Case,* 208 U. S. 274, was *United States* v. *Workingmen's Amalgamated Council,* 54 Fed. 994.

Under § 5 of the Clayton Act the decree of the court in such a case would *prima facie* bind such defendant in a subsequent civil suit. Section 8 of the Sherman Act does not use the words "organized under," but the broader phrase "authorized by." It will be further noted,

that the language is not "authorized by and existing under," but "existing under or authorized by."

Associations may be of three types: (1) A quasi-corporation, organized pursuant to a statute, to which it owes its powers and its very existence; (2) an association formed at common law but with the express sanction of a statute authorizing it so to be formed; (3) an association formed at common law which, while not expressly authorized by statute, yet is recognized by statute as properly existing and is given statutory rights and benefits not enjoyed at common law. *Eliot* v. *Freeman*, 220 U. S. 178.

In practically every State in the United States, including all of the States in which the United Mine Workers has active district branches, there are statutes distinctly recognizing trades unions as existing thereunder, and giving them a standing and protection in connection with their associate rights and interests, and the most noticeable instance of statutory recognition is the provision in § 6 of the Clayton Act, which might well be said to constitute a direct authorization by Congress of the organization and continued existence of labor unions,—certainly a distinct recognition that such associations were among those "existing under the laws of the United States," within the meaning of the Sherman Act.

Congressional recognition of the existence of trades unions similar to that by the Clayton Act, as well as their liability to prosecution as such by the United States for violation of the Sherman Act, is found in the rider to the Appropriation Acts of 1913, 1914 and 1915, 38 Stat. 53, 652, 866. Also the National Trades Union Act of June 29, 1886, 24 Stat. 86.

It may be said that since the Trades Union Act, § 2, made incorporated unions liable to suit in their corporate name, this implied an absence of such liability in a union which was not incorporated. As applied to an unincorpo-

rated union between 1886 and July 2, 1890, there might be something in this argument; indeed, we make no claim that at common law an unincorporated association is liable to suit in its associate name. The Sherman Act, however, made an advance on the common law. Although it did not purport to make labor unions, or any other unincorporated associations, subject to suit in all legal proceedings, it did render such associations liable, in their associate capacity, to suit for the commission of the particular offense forbidden by the act.

All that is necessary to hold an association liable for damages under the Sherman Act is to show its existence in some form sufficiently tangible to enable the court by its process to reach its funds or property. Federal and state statutes recognizing its existence and giving it special rights merely make its liability clearer. It can not take advantage of its associate and combined existence to harm other people in the manner forbidden by the Sherman Act, and use its associate funds for that purpose, and not at the same time have those same associate funds subject to the provisions of that statute.

II. The procedure employed in bringing defendants into court was derived by clear and necessary implication from the Sherman and Clayton Acts, and is that prescribed by the Arkansas Code, Kirby & Castle's Digest, § 7446, permitting one or more parties to be sued for all where the question is one of common or general interest and the parties very numerous. See *Branson* v. *Industrial Workers of the World,* 30 Nev. 270; Martin, Modern Law of Labor Unions, § 218; *St. Germain* v. *Bakery, &c., Union,* 97 Wash. 282; *Penny* v. *Central Coal Co.,* 138 Fed. 769; *Tinker* v. *Powell,* 23 Wyo. 352.

Both the National Organization and District No. 21 moved to dismiss the first writ of error from the Circuit Court of Appeals, and afterwards answered in the District Court, which in effect amounted to a general appearance

and a waiver of any defect of process. *Ferguson* v. *Carr,* 85 Ark. 246; *Dunbar* v. *Bell,* 90 Ark. 316; *Lowry* v. *Tile Mantel Association,* 98 Fed. 817.

While the defendant has made frequent objections on the ground that it was not an entity or suable under the Sherman Act, the record does not disclose that it has ever objected to the service of process on it in the name of its representatives as prescribed by the Arkansas Code.

We do not contend that the judgment rendered below is a personal judgment against the individual members of the United Mine Workers of America or binds the real estate of a miner in California or Pennsylvania who had no actual part in the Prairie Creek strike and who is not specifically named as a defendant in this suit.

The provision in the Arkansas Code merely removes the difficulty of getting the union into court in its associate capacity. Whether, as we believe, it is suable in its associate name, or whether it should be sued in the names of its officers as its representatives, is immaterial, since both are named in the writ and caption in the present case. The Code of Procedure of Arkansas merely applies the long-standing rule in equity cases to cases arising at common law. The cases cited by the other side are all actions at common law in jurisdictions where the procedure had not been modified by statute so as to permit a suit against a large association in the name of certain representatives.

III. The United Mine Workers of America, acting through its national officers and its official journal, as well as by its duly constituted district and local branch agencies and officers, authorized, caused, participated in, encouraged, ratified and approved the destruction of the business and property of defendants in error.

In the constitution of this national body there is obviously no attempt to limit its liability to third parties, where strikes are ordered by district branches, but merely

to provide that, as between the principal and the agent, the latter could expect no funds other than those collected from the district unless the national executive board sanctioned the strike.

Even if the constitution had required the sanction of the executive board for the institution of a local strike, such sanction was amply evident. The constitution, however, gave specific authority to District No. 21 to order such a strike on its own initiative. Instead of limiting the authority and discretion of the districts, as plaintiffs in error contend, this provision clearly enlarges it. Distinguishing, *Denaby & Cadeby Main Collieries, Ltd.* v. *Yorkshire Miners Association* [1906], A. C. 384.

It affirmatively appears in the case at bar that the association granted benefits to the strikers. The treasurer's report shows payments to the local unions participating in this strike, of more than $20,000, paid from the defense fund, which under the constitution can be used only for this purpose.

It clearly appears that the union, through its officers, its executive board, its official journal and by vote of all the delegates at its national convention, officially recognized that the destruction of plaintiffs' property and business had been brought about by the union, through its officers, members and representatives, in order to carry out its aims, objects and purposes, and that it accepted the benefit to the union from the suppression of the open shop mine and ratified the whole proceedings.

A number of English cases, decided between the decision in *Taff Vale Ry. Co.* v. *Amalgamated Society of Railway Servants* [1901], A. C. 426, and the passage of the act of Parliament which annulled it, are instructive on the question of the liability of the national union for the acts of its district and local branches. *Giblan* v. *National Amalgamated Laborers' Union* [1903], 2 K. B. 600; *Mackendrick* v. *National Union of Dock Laborers,*

48 Scot. L. Rep. 17. See also *Spaulding* v. *Evenson,* 149 Fed. 913; 150 Fed. 517; *United States* v. *American Co.,* 263 Fed. 147, 152; *Nederlandsch S. M.* v. *Stevedore's Society,* 265 Fed. 397.

This court has recognized the development of the law in the extension of corporate liability for tortious acts, which, while not strictly within the corporate power, or within the express authority of the agent who committed them, were within the scope of the agent's employment, and were done on behalf of and for the benefit of the principal, even though against its express orders. *Salt Lake City* v. *Hollister,* 118 U. S. 256, 260; *Denver & Rio Grande Ry. Co.* v. *Harris,* 122 U. S. 597; *Washington Gas Light Co.* v. *Lansden,* 172 U. S. 534, 544; *New York Central R. R. Co.* v. *United States,* 212 U. S. 481, 492; *Joplin Mercantile Co.* v. *United States,* 213 Fed. 926; *In re Grand Union Co.,* 219 Fed. 353, 363; *United States* v. *Nearing,* 252 Fed. 223.

The evidence in this case sustains the liability of the union on four distinct grounds:

(1) The constitution authorized the district to call this strike. Plaintiffs offered to prove that the National Organization, both through its convention proceedings, and through editorials and articles in its official journal, for years before 1914, had not only encouraged its membership to suppress open shop operations, but by recounting, often with express approval, usually without disapproval, and always without disciplinary action, illegal methods used in other districts to accomplish this result, had sanctioned the use of such methods in carrying on its strikes. The ruling excluding this evidence was clearly erroneous, and as it was made in the instance of defendants, they clearly cannot now base any contention on the absence of such evidence in the record. *Missouri, K. & T. Ry. Co.* v. *Elliott,* 102 Fed. 96, 103. But there was other evidence, admitted, to the same effect.

(2) The Association, through its executive board, its president and its official journal, actively encouraged and thus participated in the illegal proceedings at Prairie Creek, while these proceedings were going on.

(3) The Association, through its official journal and by resolutions of its executive board and of the convention of all its delegates, expressly and officially recognized that the active participants in the Prairie Creek affair had acted as its representatives and in its behalf in carrying out its aims, objects and purposes.

(4) The failure by the union to express its official disapproval, or to exercise the control which it had over the district and local branches, officers and members, and its failure to take steps to discipline them and thus prevent a recurrence of the same thing in other fields, was of itself evidence both of ratification and that what had been done was with the authority and approval of the union.

If under the law no trade union or no union leader could be held responsible for damage in labor disputes without direct evidence that it or he personally incited the particular disturbances which gave rise to the trouble, labor leaders would be for all practical purposes beyond the reach of the law. The damage done in labor disputes is caused for the most part by entirely irresponsible parties, members of the union or their sympathizers, many of whom at the time are unrestrainable by their leaders, even if the latter wished to restrain them.

Under the law the test of the responsibility of the union and of the higher officials thereof, for activities of the members in a labor dispute, is gauged not only by whether or not the union officials specifically incited the particular activities, but by a broader test, viz.. Did the union officials and union organization set in motion the machinery which in the natural course of events and according to previous experience would lead to the injurious results?

Where a union declares or conducts a strike in which injury to property is done by its members or by those acting in conjunction with them, the union and its officers will be held responsible, unless the damage done is such as might not readily be foreseen by them when they set in motion the forces which have caused it, and unless, also, as soon as they learn of the illegal acts, whether during their commission or after the damage has been done, they clearly show their good faith and disapproval of what has happened, not merely by words but by actions. *Loewe* v. *Lawlor*, 208 U. S. 274; *Southern Ry. Co.* v. *Machinists Local Union*, 111 Fed. 49; *Allis-Chalmers Co.* v. *Reliable Lodge*, 111 Fed. 264; *Union Pacific R. R. Co.* v. *Ruef*, 120 Fed. 102; *Allis-Chalmers Co.* v. *Iron Molders Union*, 150 Fed. 155; *Phillips Sheet & Tin Plate Co.* v. *Amalgamated Association of Iron, Steel & Tin Workers*, 208 Fed. 335; *Alaska S. S. Co.* v. *International Longshoremen's Association*, 236 Fed. 964; *Kroger Co.* v. *Retail Clerks' International Protective Assn.*, 250 Fed. 890, 896. See also *Franklin Union* v. *People*, 220 Ill. 355; *Illinois Central R. R. Co.* v. *International Association of Machinists*, 190 Fed. 910; *Stephens* v. *Ohio State Telephone Co.*, 240 Fed. 759, 778; *Niles-Bement Co.* v. *Iron Moulders Union*, 246 Fed. 851, 863–864.

IV. The destruction of the business and property of defendants in error was accomplished in the course of an unlawful combination and conspiracy in restraint of interstate commerce.

The motive of the unionists may have been to benefit their craft by unionizing all the mines of the country; their immediate purpose was to prevent plaintiffs from shipping their coal to other States in competition with that there mined with union labor.

The conspirators must be held to have intended the necessary and direct consequences of their acts. *United States* v. *Patten*, 226 U. S. 525. Furthermore, it is not

the specific intent of the immediate participants which is important, but the collective intent, the intent of the association which inspired, instigated and conducted the whole affair.

In cases of this kind it is the association that is the essence of the illegal combination. The immediate participants are usually but the ignorant tools, often having no specific intent but a blind rage inspired by the brains of the association higher up.

In the *Knight Case,* 156 U. S. 1, there was no evidence of a specific intention to restrain interstate commerce or to prevent other people from engaging therein. The question was simply whether the bare acquisition under one control of a number of competing sugar plants, without evidence of illegal means used or of a purpose to lay any plant idle, in itself amounted to an attempt at a monopoly or a combination in restraint of trade.

If in that case it had appeared, as it did in *Pennsylvania Sugar Refining Co.* v. *American Sugar Refining Co.,* 166 Fed. 254, in *Shawnee Compress Co.* v. *Anderson,* 209 U. S. 423, or in *United States* v. *Reading Co.,* 226 U. S. 324, that the purpose was to close the plants up or to prevent them from competing with the defendant, the court which decided the *Knight Case* would certainly have held the combination illegal. Even so, the case would not attain the flagrancy of " the class of restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of trade except on conditions that the combination imposes." *Loewe* v. *Lawlor,* 208 U. S. 274. It is in the latter class that the combination here involved falls. Where, as here, it is conclusively shown that the purpose of the illegal acts was to prevent shipment of commodities from one State to another, then every means to attain that result is a direct and unreasonable interference. *Nash* v. *United States,* 229 U. S. 373.

The fact that coal mining is not interstate commerce in no way proves that the destruction of a coal mine for the purpose of restraining interstate commerce does not have that effect.

Ever since the decision in *Welton* v. *Missouri*, 91 U. S. 275, 282, it has been settled that a state statute discriminating against articles which have come from other States or are destined thereto, is unconstitutional, even though it be of a nature which would bring it, but for the discrimination, within the recognized power of the State. In such cases the attempted discrimination shows a conclusive intent by the State to restrain interstate commerce, and, such intent being shown, every restraint thereby produced is held to be direct and unreasonable. See also *Darnell & Son Co.* v. *Memphis*, 208 U. S. 113; *In re Debs*, 158 U. S. 564, 600.

The facts proved in the case at bar show beyond question a combination and conspiracy in restraint of interstate commerce,—because the acts done so necessarily produced that result that no proof of specific intent was necessary; and because such specific intent was conclusively proved.

V. There was no error in the joinder of parties or causes of action. Arkansas Laws, 1905, p. 798; *St. Louis &c. R. R. Co.* v. *Broomfield*, 83 Ark. 288; *Mahoney* v. *Roberts*, 86 Ark. 130; *Southern Anthracite Coal Co.* v. *Bowen*, 93 Ark. 140; *Fidelity Insurance Co.* v. *Friedman*, 117 Ark. 71.

The Sherman Act left the procedure to the local law.

The Act of Congress of February 26, 1919, Jud. Code, § 269, directing that technical errors be disregarded, overcomes any conflict that might be claimed between the Arkansas and federal practice.

*Mutual Life Insurance Co.* v. *Hillmon*, 145 U. S. 285, is to be distinguished. There was apparently no Kansas statute " existing at the time " which authorized the pro-

cedure in that case, and § 921, Rev. Stats., as construed
by the court, did not go so far as to authorize it. In fact
§ 819 prohibited it.

The record fails to show that defendants made any
claim to additional challenges.

When the Act of 1905, as construed by the Arkansas
Supreme Court in connection with §§ 6148, 6130, 6084,
of the Arkansas Code, extended the power and discretion
of the trial court in joinder cases, the Conformity Act,
Rev. Stats. § 914, operated to add such additional
powers to those already given the federal trial judges
under § 921. *O'Connell* v. *Reed,* 56 Fed. 536; *Union
Pacific R. R. Co.* v. *Jones,* 49 Fed. 343; *Sawin* v. *Kenny,*
93 U. S. 289; *Rush* v. *Newman,* 58 Fed. 158; *Bond* v.
*Dustin,* 112 U. S. 604; *Glenn* v. *Sumner,* 132 U. S. 152,
156; *Bryson* v. *Gallo,* 180 Fed. 70.

The case at bar is analogous to the cases arising under
the Employers' Liability Act, in which there need be
no apportionment of the damages because the law pro-
vided a method. *Gulf, Colorado & Santa Fe Ry. Co.* v.
*McGinnis,* 228 U. S. 173; *Central Vermont Ry. Co.* v.
*White,* 238 U. S. 507; *Chesapeake & Ohio Ry. Co.*
v. *Kelly,* 241 U. S. 485; *Kansas City Southern Ry. Co.*
v. *Leslie,* 238 U. S. 599, 603.

The contention of plaintiffs in error that these com-
panies had independent claims, which they could have
prosecuted separately, overlooks not only the facts rela-
tive to their organization but the nature of the right of
recovery given under the Sherman Act,—for injury to
business. The good-will of all these companies was
owned and enjoyed by them jointly and was attacked
by the United Mine Workers as a joint operation.

VI. There was no error in requiring the representa-
tives of the association to produce the books and papers
called for. *Wilson* v. *United States,* 221 U. S. 361;
*Wheeler* v. *United States,* 226 U. S. 478; *Grant* v. *United*

*States,* 227 U. S. 74; *Johnson* v. *United States,* 228 U. S. 457.

*Mr. Daniel Davenport, Mr. Walter Gordon Merritt* and *Mr. Thomas Hewes,* by leave of court, filed a brief as *amici curiæ.*

We join in the contention of the plaintiffs that the United Mine Workers of America and the other voluntary associations sued as defendants come within the statutory definition of " associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State . . ." Sherman Act § 8.

The record discloses, as does also *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, the essential characteristics of the United Mine Workers of America: A membership of over 400,000; representative conventions like stockholders' meetings as the source of power; the election of executive officers and an executive committee chosen from the districts, who, in the interim between conventions, administer its affairs and wield the enormous strength of this body; a name in which it does business; a central office; an official magazine; a complete system for collecting dues; a large income and accumulated wealth freely spent in furthering the ends of the union.

Incorporation of this body would not require it to alter in any substantial way its present organization. It is a complete working machine, having all the earmarks of an entity entirely apart from its members, and is so acting.

The Sherman Law creates rights and imposes duties. It gives to persons and the public the right to be free from injury through unlawful restraints of trade and imposes the duty on persons to refrain from so causing injury. The evidence shows clearly that the defendant union, acting in its organized capacity, as an entity, can and has

successfully restrained trade and has deliberately ruined the plaintiffs. It has common funds from which damages can be collected. It should be made to pay. It is clearly an entity apart from its members. Common sense declares this; economic facts declare it; the law should declare it. Pollock, First Book of Jurisprudence, 2nd ed., pp. 110, 111, 114; Wald's Pollock on Contracts, 3rd ed., by Williston, p. 124, *et seq;* 15 Harv. Law Rev., p. 311; Holland, Jurisprudence, 11th ed., pp. 80, 82, 87, 88, 91, 93, 96, 97, 335, 336, 337; *Taff Vale Ry. Co.* v. *Amalgamated Society* [1901], A. C. 426; *Brent* v. *New Orleans,* 41 La. Ann. 1098.

In *Walworth* v. *Holt,* 4 Myl. & Cr. 619, the court declared its duty " to adapt its practice and course of proceeding to the existing state of society."

It is not necessary that legal systems shall create artificial persons. The ideals and necessities of mankind recognize them before the law. Pound, Readings on the History and System of the C. L., p. 448, from Gareis, Science of Law, § 15.

This statement is a convenient explanation of the theory of lost charters described by Blackstone when discussing the necessity of sovereign recognition for common-law juristic persons.

It is undoubtedly true that the common law for a long time knew of but two classes of legal persons—natural persons and artificial persons. The only artificial person recognized was the corporation. Coke Litt., 2–a; 1 Black. Comm., pp. 123, 467, *et seq.*

A careful examination of many authorities fails to disclose any particularly illuminating explanation of this fact except this: In the early days of Rome no sovereign permission was necessary to create a so-called corporation with its distinct feature of immortality, but later such bodies were looked upon with extreme disfavor unless they had been officially approved by the State.

The State felt it necessary for self-protection to exercise control over bodies of individuals who might acquire vast and even rival power. And this principle, though not at first recognized in England, likewise in time became the law. 3 Holdsworth, History of the English Law, pp. 362, 373; Pollock and Maitland, History of English Law, Bk. II. c. II, § 12; Taylor, Science of Jurisprudence, p. 580, *et seq;* Markby, Elements of Law, p. 82, *et seq; Lloyd* v. *Loaring,* 6 Ves. 773.

The power of the sovereign in thus exercising control was made effective through the passive means of refusing to recognize in unincorporated bodies either rights or duties. But voluntary associations continued to grow in number and because of their dynamic activity in society it became absolutely essential in the administration of justice to make them amenable to legal process, and so the chancellor invented the representative action and in the courts of equity for two hundred years they have sued and been sued, have enforced rights and been compelled to respect duties. *Meux* v. *Maltby,* 2 Swan. 277; Story, Equity Pleadings, 8th ed., § 77.

And so Congress in many statutes has included in its definition of " persons," partnerships, companies and voluntary associations.

Therefore, it seems historically that the State began by refusing to recognize associations, and when this did not stop their growth, looked to their regulation and supervision by giving them juristic personality. 30 Harv. Law Rev., 683, 684.

The inevitable revulsion of justice against the archaic rigidity of the common-law theory is found in the opinion of Lord Lindley in the *Taff Vale Case, supra,* p. 443.

The question of the right to sue an association is purely formal and procedural. *Saunders* v. *Adams Express Co.,* 71 N. J. L. 270; *Mayhew & Isbell Lumber Co.* v. *Valley Truck Growers' Assn.,* 216 S. W. 225; *Taff Vale*

*Ry. Co. v. Amalgamated Society* [1901], A. C. 426.   It
does not alter duties or rights.  *Taff Vale Case, supra,*
pp. 438, 442–445; *Huth v. Humboldt,* 61 Conn. 227.   It
is held in some cases that unless the question of the
suability of an association is raised by demurrer it is
waived.   *United Mine Workers v. Cromer,* 159 Ky. 605;
*Agricultural Club v. Hirsch,* 39 Cal. App. 433.   Where
an unincorporated association appears and answers as
an entity and is named in an injunction order, it can
thereafter be punished for contempt as an entity.  *Barnes
& Co. v. Chicago Typographical Union,* 232 Ill. 402.
Such a question cannot be raised for the first time on
appeal.  *Iron Molders' Union v. Allis-Chalmers Co.,* 166
Fed. 45.   These cases are cited not with a view to claim-
ing that defendants have waived their rights, but in
support of the contention that the question is purely a
technical one as to the form of a writ and not one of sub-
stantive law.

Every argument of public policy is in favor of our con-
tention.   In these days when associations of employers
and associations of workmen, acting as a unit under a
constitution and by-laws, electing officers and controlling
large funds, perform practically all the functions of a
corporate entity and exercise a power for good or ill far
beyond that of individuals, there is every reason why
Congress, when dealing with their most familiar activi-
ties, should be presumed to have brought them within
the reach of civil process.   Collective responsibility should
accompany collective action.   As was said in the *Taff
Vale Case,* if this principle be denied, injured parties are
without a remedy because of the impracticability of en-
forcing the law against the numerous members of asso-
ciations.   If any fair construction of the statute will
permit, it is the duty of the court to declare that Congress
intended to avoid such an unfortunate result.   Law ex-
ists for society and the instincts of right and wrong must

be given effect by the courts wherever reasonable interpretation of law and laws permit. 30 Harv. Law. Rev. 680.

The Anti-Trust Law was enacted primarily to protect the public in the enjoyment of the benefits of the free flow of commerce. It granted such protection against combinations of employees (*Loewe* v. *Lawlor*, 208 U. S. 274,) as well as combinations of employers, and to that end is presumed to have brought within the clutches of the law voluntary associations of employers and employees, which are the commonest instrumentalities by which restraints of trade are accomplished. When we consider the nature of the mischief which the statute aimed to remedy, the comprehensive remedies provided, and the fact that an important part of the remedy lay in controlling associations, there is every reason to believe that the words " associations existing under or authorized by the laws," etc., intended to include the ordinary and familiar type of associations of employers and employees which were largely the cause of that mischief. To reach a contrary conclusion we must declare what today sounds amazing—that labor unions do not exist under, and are not authorized by, the laws of any State or of the United States. How absurd it would be to impute to Congress an intention to include combinations of employees and to keep out of reach of civil or criminal process those institutions which are entities in fact and the sole agencies whereby employees restrain trade. How strained it is to say that Congress intended this result when it took care to enumerate all associations existing under any state or federal law. How unwarranted such a conclusion would be when it runs counter to the needs of society and negatives the rule that where there is a right there is a remedy, as so conspicuously shown in this case. The statute can be naturally construed and should be construed to remove a technical obstacle to the administration of justice.

The aptness of the words used by Congress as applied
to labor unions is emphasized by the extent to which
unions have been recognized and have received benefits
and privileges through federal and state enactments.
These statutes show to what a surprising extent unions
are " associations existing under or authorized by " state
and federal laws.

. The defendants contend that the words of the statute
only include associations organized under the express pro-
vision of some statute.  If that were so, why did the
legislators not stop with the words " authorized by " in-
stead of also providing for associations " existing under "
the laws?  But authority as well as reason oppose the
contention that the words used in this statute are limited
to associations organized under some statute.  In the con-
struction of our revenue laws just the contrary has been
held. *Eliot* v. *Freeman,* 220 U. S. 178.

That this has been the accepted construction by the
executive and judiciary branches of the Government in
connection with the Anti-Trust Law is shown by the rec-
ords in a number of the cases where judgment was entered
against voluntary associations.

See also, *Hillenbrand* v. *Building Trade Council,* 14 Oh.
Dec. (N. P.) 628; 15 Harv. Law Rev. 311; 30 *id.,* 263.

MR. CHIEF JUSTICE TAFT, after stating the case, de-
livered the opinion of the court.

There are five principal questions pressed by the plain-
tiffs in error here, the defendants below.  The first is that
there was a misjoinder of parties plaintiff.  The second is
that the United Mine Workers of America, District No.
21, United Mine Workers of America, and the local unions
made defendants, are unincorporated associations and not.
subject to suit and therefore should have been dismissed
from the case on motions seasonably made.  The third is
that there is no evidence to show any agency by the

United Mine Workers of America, in the conspiracy charged or in the actual destruction of the property, and no liability therefor. The fourth is that there is no evidence to show that the conspiracy alleged against District No. 21 and the other defendants, was a conspiracy to restrain or monopolize interstate commerce. The fifth is that the court erred in a supplemental charge to the jury, which so stated the court's view of the evidence as to amount to a mandatory direction coercing the jury into finding the verdict which was recorded.

First. It does not seem to us that there was a misjoinder of parties under the procedure as authorized in Arkansas. In that State the law provides that when causes of action of a like nature, or relative to the same question, are pending before any of its circuit or chancery courts, the court may make such orders and rules regulating proceedings therein as may be conformable to the usages of courts for avoiding unnecessary costs or delay in the administration of justice, and may consolidate said causes when it appears reasonable to do so. In *Southern Anthracite Coal Co.* v. *Bowen,* 93 Ark. 140, the court consolidated, over objection by defendant, two suits by two workmen who had been injured in the same accident, and the Supreme Court approved of this action. In *Fidelity-Phenix Fire Insurance Co.* v. *Friedman,* 117 Ark. 71, it was held that actions by an injured person and by a mortgagee against eight insurance companies on eight different fire insurance policies could be consolidated against the objection by defendants, and they were tried together. Of course, the application of this rule of the Arkansas courts under the Federal Conformity Act, will be qualified to prevent injury to any substantial right secured by federal law in the trial. It is a case for the exercise of reasonable discretion by the trial court. We cannot say that that discretion was abused in this case. All the companies for which the plaintiffs herein are receivers, were united together in interest

and were largely under the control of one of the companies. The active manager of all of them for years was Franklin Bache. He was the first receiver, and as such the plaintiff. There was no need for a division in the verdict of damages found, because the union of interest between the plaintiffs involved no difficulty in the distribution among them of the amount found. The judgment is *res judicata* as to all the plaintiffs, and we can find no substantial reason for disturbing it on this ground. No difficulty presented itself with respect to the challenge of jurors by either side, and so far as appears there was no embarrassment to the defendants growing out of the union of the plaintiffs. On the contrary, an examination of the evidence shows that all the witnesses for the defendants treated the plaintiffs as a unit. They were so regarded in business and in the neighborhood where the mines were.

Second. Were the unincorporated associations, the International Union, District No. 21, and the local unions suable in their names? The United Mine Workers of America is a national organization. Indeed, because it embraces Canada it is called the International Union. Under its constitution, it is intended to be the union of all workmen employed in and around coal mines, coal washers and coke ovens on the American continent. Its declared purpose is to increase wages and improve conditions of employment of its members by legislation, conciliation, joint agreements and strikes. It demands not more than eight hours a day of labor. The union is composed of workmen eligible to membership and is divided into districts, sub-districts and local unions. The ultimate authority is a general convention to which delegates selected by the members in their local organizations are elected. The body governing the union in the interval between conventions is the International Board consisting of the principal officers, the president, vice-president and secretary-treasurer, together with a member from

each district. The president has much power. He can remove or suspend International officers, appoints the national organizers and subordinates, and is to interpret authoritatively the constitution, subject to reversal by the International Board. When the Board is not in session, the individual members are to do what he directs them to do. He may dispense with initiation fees for admission of new locals and members. The machinery of the organization is directed largely toward propaganda, conciliation of labor disputes, the making of scale agreements with operators, the discipline of officers, members, districts and locals, and toward strikes and the maintenance of funds for that purpose. It is admirably framed for unit action under the direction of the National officers. It has a weekly journal, whose editor is appointed by the president, which publishes all official orders and circulars, and all the union news. Each local union is required to be a subscriber, and its official notices are to be brought by the secretary to the attention of the members. The initiation fees and dues collected from each member are divided between the national treasury, the district treasury and that of the local. Should a local dissolve, the money is to be transmitted to the National treasury.

The rules as to strikes are important here. Section 27 of Article IX of the constitution is as follows:

" The Board shall have power between conventions, by a two-thirds vote, to recommend the calling of a general strike, but under no circumstances shall it call such a strike until approved by a referendum vote of the members."

Under Article XVI, no district is permitted to engage in a strike involving all or a major portion of its members without sanction of the International Convention or Board.

Section 2 of that article provides that districts may order local strikes within their respective districts " on

their own responsibility, but where local strikes are to be
financed by the International Union, they must be sanc-
tioned by the International Executive Board."

Section 3 provides that in unorganized fields the Con-
vention or Board must sanction strikes and no financial
aid is to be given until after the strike has lasted four
weeks, unless otherwise decided by the Board. The Board
is to prescribe conditions in which strikes are to be
financed by the International Union and the amount of
strike relief to be furnished the striking members. In
such cases, the president appoints a financial agent to as-
sume responsibility for money to be expended from the
International funds, and he only can make binding con-
tracts. There is a uniform system of accounting as to the
disbursements for strikes.

The membership of the union has reached 450,000.
The dues received from them for the national and district
organizations make a very large annual total, and the ob-
ligations assumed in travelling expenses, holding of con-
ventions, and general overhead cost, but most of all in
strikes, are so heavy that an extensive financial business is
carried on, money is borrowed, notes are given to banks,
and in every way the union acts as a business entity, dis-
tinct from its members. No organized corporation has
greater unity of action, and in none is more power cen-
tered in the governing executive bodies.

Undoubtedly at common law, an unincorporated asso-
ciation of persons was not recognized as having any other
character than a partnership in whatever was done, and it
could only sue or be sued in the names of its members, and
their liability had to be enforced against each member.
*Pickett* v. *Walsh,* 192 Mass. 572; *Karges Furniture Co.* v.
*Amalgamated Woodworkers Local Union,* 165 Ind. 421;
*Baskins* v. *United Mine Workers of America,* 234 S. W. 464.
But the growth and necessities of these great labor organi-
zations have brought affirmative legal recognition of their

9545°—23——25

existence and usefulness and provisions for their protection, which their members have found necessary. Their right to maintain strikes, when they do not violate law or the rights of others, has been declared. The embezzlement of funds by their officers has been especially denounced as a crime. The so-called union label, which is a quasi trademark to indicate the origin of manufactured product in union labor, has been protected against pirating and deceptive use by the statutes of most of the States, and in many States authority to sue to enjoin its use has been conferred on unions. They have been given distinct and separate representation and the right to appear to represent union interests in statutory arbitrations, and before official labor boards. We insert in the margin an extended reference,[1] furnished by the industry of counsel, to

---

[1] 1. Legalization of labor unions and labor combinations:

*The Clayton Act*—approved October 15, 1914, § 6, 38 Stat. 730, 731. *California*—Penal Code, 1906, p. 581. *Colorado*—Rev. Stats. 1908, § 3924. *Maryland*—Supp. Anno. Code, 1914, Art. 27, § 40. *Massachusetts*—C. 778, Acts & Res. approved July 7, 1914. *Minnesota*—C. 493, approved April 21, 1917. *Nevada*—Rev. Laws, 1912, § 6801. *New Jersey*—Comp. Stats. 1910, § 128, p. 3051. *New York*—Consol. Laws 1909, c. 40, § 582. *North Dakota*—Rev. Code 1905, § 8770. *Oklahoma*—Rev. Laws 1910, § 3764. *Pennsylvania*—Dig. Statute Law 1920, § 21247. *Texas*—Rev. Civ. Stats. 1911, Arts. 5244-5246. *Utah*—C. 68, approved March 8, 1917; Laws of 1917, c. 68, § 1. *West Virginia*—Acts of 1907, c. 78, § 19.

2. Exemption from anti-trust laws by statute or judicial decision:

*California*—Acts of 1909, c. 362, § 13. *Iowa*—*Rholf* v. *Kasemeier,* 140 Ia. 182. *Louisiana*—Acts of 1892, Act No. 90, § 8; Rev. Laws, 1897, p. 205. *Michigan*—Comp. Laws, 1897, § 11382. *Montana*—Rev. Code 1907, § 8289; Acts of 1909, c. 97, § 2. *New Hampshire*—Laws of 1917, c. 177, § 7. *Nebraska*—*State* v. *Employers of Labor,* 102 Neb. 768. *Wisconsin*—Stats. of 1913, § 1747h.

3. Right given to labor unions to sue to enjoin infringement of registered union label or trademark:

*Arkansas*—Acts of 1905, Act 309, § 7. *Colorado*—Mills' Supp. 1904, § 2985; Rev. Stats. 1908, § 6848. *Florida*—Gen. Stats. 1906, § 3172. *Idaho*—Rev. Code of 1908, § 1453. *Illinois*—Rev. Stats.

legislation of this kind. More than this, equitable procedure adapting itself to modern needs has grown to recognize the need of representation by one person of many, too numerous to sue or to be sued (Story Equity Pleadings, 8th ed., §§ 94, 97; *St. Germain* v. *Bakery, &c., Union,* 97 Wash. 282; *Branson* v. *Industrial Workers of the World,* 30 Nev. 270; *Barnes & Co.* v. *Chicago Typographical Union,* 232 Ill. 402); and this has had its influence upon the law side of litigation, so that, out of the very necessities of the existing conditions and the utter impossibility of doing justice otherwise, the suable character of such an organization as this has come to be recognized in some jurisdictions, and many suits for and against labor unions are reported in which no question has been raised as to the right to treat them in their closely united

1908, c. 140, § 4. *Iowa*—Code of 1897, § 5050. *Kansas*—Gen. Stats. 1915, § 11657. *Kentucky*—Stats. 1903, c. 130, § 4750. *Louisiana*—Acts of 1898, Act No. 49, § 5. *Maryland*—Supp. Anno. Code, 1914, Art. 27, § 53. *Montana*—Rev. Code 1907, § 8455. *Nebraska*—Comp. Stats. 1913, § 3570. *Nevada*—Rev. Laws 1912, § 4636. *New Hampshire*—Laws of 1895, c. 42, § 4. *New York*—Consol. Laws 1909, c. 31, § 16. *Oregon*—Bellinger & Cotton's Anno. Stats. 1902, § 1845. *Pennsylvania*—Laws of 1901, Act No. 84, § 4; Dig. Statute Law, 1920, § 21241. *Rhode Island*—Gen. Laws 1909, c. 196, § 5. *South Dakota*—Rev. Code 1903, § 3194. *Tennessee*—Acts of 1905, c. 21, § 6. *Texas*—Civil Code, 1911, Art. 705. *Vermont*—Laws of 1908, Act No. 121, § 5. *Virginia*—Code of 1904, § 1906d, par. (5). *Washington*—Codes & Stats. 1910, § 9496. *West Virginia*—Acts of 1901, c. 5, § 5; Code of 1913, § 3582. *Wisconsin*—Stats. of 1911, c. 84a, § 1747a-5. *Wyoming*—Comp. Stats., 1910, c. 218, § 3441.

4. Unauthorized use of registered union label or trademark made an offense:

*Alabama*—Code of 1907, §§ 7322, 7323. *Arizona*—Penal Code, §§ 355-358. *Arkansas*—Acts of 1905, Act No. 309 (amended by c. 131, Acts of 1909). *California*—Political Code, 1906, §§ 3200-3201; Penal Code, 1906, §§ 349a-351 (amended by c. 181, Acts of 1911). *Colorado*—Mills' Supp. 1904, § 2985-1 to 2985-s; Rev. Stats. 1908, § 6844. *Connecticut*—Gen. Stats. 1902, §§ 4907-4912 (amended by

action and functions as artificial persons capable of suing and being sued. It would be unfortunate if an organization with as great power as this International Union has in the raising of large funds and in directing the conduct of four hundred thousand members in carrying on, in a wide territory, industrial controversies and strikes, out of which so much unlawful injury to private rights is possi-

c. 151, Acts of 1907). *Delaware*—Acts of 1899, c. 266. *Florida*—Gen. Stats. 1906, §§ 3169–3172. *Georgia*—Code of 1910, §§ 1989–1992. *Idaho*—Rev. Codes of 1908, §§ 1449–1455. *Illinois*—Rev. Stats. 1908, c. 140, §§ 1–7. *Indiana*—Anno. Stats. 1901, §§ 8693–8703; 3 Burns Anno. Stats. 1908, §§ 10453–10463. *Iowa*—Code of 1897, §§ 5049–5051. *Kansas*—Gen. Stats. 1909, §§ 9675–9680; Gen. Stats. 1915, §§ 11654–11659. *Kentucky*—Stats. of 1903, §§ 4749–4755. *Louisiana*—Acts of 1898, Act No. 49. *Maine*—Rev. Stats. 1903, c. 40, §§ 30–36. *Maryland*—Pub. Gen. Laws 1903, Art. 27, §§ 43–48. *Massachusetts*—Rev. Laws 1902, c. 72, §§ 7–14. *Michigan*—Comp. Laws 1897, §§ 11681–11686 (amended by c. 279, Acts of 1913). *Minnesota*—Rev. Laws 1905, §§ 5072–5076. *Missouri*—Rev. Stats. 1909, §§ 11789–11796. *Montana*—Penal Code 1907, §§ 8452–8457. *Nebraska*—Comp. Stats. 1911, §§ 4169–4173. *Nevada*—Rev. Laws 1912, §§ 4635–4637. *New Hampshire*—Acts of 1895, c. 42. *New Jersey*—Comp. Stats. 1910, pp. 1802, 5643–5648. *New York*—Consol. Laws 1909, c. 31, §§ 15, 16. *Ohio*—Gen. Code 1910, §§ 6219–6227, 13102, 13103, 13153–13155; Acts of 1911, p. 420. *Oklahoma*—Rev. Laws 1910, §§ 8211–8217. *Oregon*—Anno. Codes and Stats. 1902, §§ 1841–1848. *Pennsylvania*—Dig. Statute Law, 1920, §§ 21236–21243. *Rhode Island*—Gen. Laws 1909, c. 196. *South Dakota*—Political Code 1903, §§ 3190–3195. *Tennessee*—Acts of 1905, c. 21. *Texas*—Rev. Civ. Stats. 1911, Arts. 705, 706; Rev. Crim. Code, Arts. 1395, 1396. *Utah*—Comp. Laws 1907, §§ 2720–2723, 4482, 4483. *Vermont*—Pub. Stats. 1906, §§ 4962–4967; Acts of 1908, No. 121. *Virginia*—Code of 1904, § 1906d. *Washington*—Codes and Stats. 1910, §§ 9492–9500. *West Virginia*—Acts of 1901, c. 5; Hogg's Code, §§ 3578–3585; Code of 1913, § 487. *Wisconsin*—Stats. 1911, § 1747a. *Wyoming*—Comp. Stats. 1910, §§ 3439–3444.

5. Unauthorized use of union card, badge, or insignia made an offense:

*California*—Acts of 1909, c. 331. *Connecticut*—Acts of 1907, c. 113, § 2. *Massachusetts*—Acts of 1909, c. 514, § 32. *Minnesota*—

ble, could assemble its assets to be used therein free from liability for injuries by torts committed in course of such strikes. To remand persons injured to a suit against each of the 400,000 members to recover damages and to levy on his share of the strike fund, would be to leave them remediless.

---

Rev. Laws 1905, § 5053, par. 4. *Montana*—Rev. Code 1907, § 8866. *New York*—Consol. Laws, 1909, c. 40, § 1278. *Ohio*—Gen. Code 1910, § 13163. *Oregon*—Acts of 1911, c. 73, §§ 1, 3. *Pennsylvania*—Dig. Statute Law 1920, § 1050. *Texas*—Rev. Crim. Stats. 1911, Art. 425. *Virginia*—Acts of 1908, c. 54, § 1.

6. Right to participate in selection of membership of boards of arbitration in labor controversies:

*Alabama*—Acts of 1911, p. 320, § 6. *Alaska*—Acts of 1913, c. 70, § 2. *Iowa*—Acts of 1913, c. 292, §§ 1, 2. *Indiana*—Anno. Stats. 1901, § 7050 e, f. *Idaho*—Rev. Code 1909, §§ 1430, 1431. *Louisiana*—Rev. Stats. 1897, Act No. 139, Acts of 1894, § 1. *Minnesota*—Rev. Laws 1905, § 1828. *Nevada*—Rev. Laws 1912, § 1930. *Nebraska*—Rev. Stats. 1913, § 3638. *Texas*—Rev. Civ. Stats. 1911, Art. 71.

7. Right to have member of union on board of arbitrators:

*Connecticut*—Gen. Stats. 1902, § 4708. *Illinois*—Hurd's Rev. Stats. 1906, c. 10, § 19. *Indiana*—Anno. Stats. 1901, § 1750b. *Idaho*—Rev. Code 1909, § 1427. *Massachusetts*—Acts of 1909, c. 514, § 10. *Maine*—Acts of 1909, c. 229, § 2. *Missouri*—Rev. Stats. 1909, § 7802. *Montana*—Rev. Code 1907, §§ 1670, 1671. *Nebraska*—Rev. Stats. 1913, § 3633. *New Hampshire*—Acts of 1911, c. 198, § 3, as amended by c. 186, Acts of 1913. *South Carolina*—Acts of 1916, Act No. 545, § 8. *Utah*—Comp. Laws 1907, § 1324. *Vermont*—Acts of 1912, Act No. 190, § 1.

8. Embezzlement of funds of labor union made a special offense:

*Nebraska*—Rev. Stats. 1913, § 8659. *New Hampshire*—Pub. Stats. 1891, c. 273, § 17, as amended by Acts of 1905, c. 1. *Pennsylvania*—Dig. Statute Law 1920, § 21252.

9. Bribery of union representative made an offense:

*Nevada*—Rev. Laws 1912, § 6794. *New Jersey*—Acts of 1911, c. 94, § 1. *New York*—Consol. Laws 1909, c. 40, § 380.

10. All public printing to bear union label:

*Maryland*—Pub. Gen. Laws 1911, Art. 58, § 9. *Montana*—Rev. Code 1907, § 254. *Nevada*—Rev. Laws 1912, § 4309.

In the case of *Taff Vale Ry. Co.* v. *Amalgamated Society of Railway Servants,* [1901] A. C. 426, an English statute provided for the registration of trades unions, authorized them to hold property through trustees, to have agents, and provided for a winding up and a rendering of accounts. A union was sued for damages growing out of a strike. Mr. Justice Farwell, meeting the objection that the union was not a corporation and could not be sued as an artificial person, said:

" If the contention of the defendant society were well founded, the Legislature has authorized the creation of numerous bodies of men capable of owning great wealth and of acting by agents with absolutely no responsibility for the wrongs that they may do to other persons by the use of that wealth and the employment of those agents."

He therefore gave judgment against the union. This was affirmed by the House of Lords. The legislation in question in that case did not create trade unions but simply recognized their existence and regulated them in certain ways, but neither conferred on them general power to sue, nor imposed liability to be sued. See also *Hillenbrand* v. *Building Trade Council,* 14 Ohio Dec. (N. P.) 628. Holland Jurisprudence, 12th ed., 341; Pollock's First Book on Jurisprudence, 2nd ed., 125.

Though such a conclusion as to the suability of trades unions is of primary importance in the working out of justice and in protecting individuals and society from possibility of oppression and injury in their lawful rights from the existence of such powerful entities as trade unions, it is after all in essence and principle merely a procedural matter. As a matter of substantive law, all the members of the union engaged in a combination doing unlawful injury are liable to suit and recovery, and the only question is whether when they have voluntarily, and for the purpose of acquiring concentrated strength and the faculty of quick unit action and elasticity, created a self-

acting body with great funds to accomplish their purpose, they may not be sued as this body, and the funds they have accumulated may not be made to satisfy claims for injuries unlawfully caused in carrying out their united purpose. Trade unions have been recognized as lawful by the Clayton Act; they have been tendered formal incorporation as National Unions by the Act of Congress, approved June 29, 1886, c. 567, 24 Stat. 86. In the Act of Congress, approved August 23, 1912, c. 351, 37 Stat. 415, a commission on industrial relations was created providing that three of the commissioners should represent organized labor. The Transportation Act of 1920, c. 91, §§ 302–307, 41 Stat. 469, recognizes labor unions in creation of railroad boards of adjustment, and provides for action by the Railroad Labor Board upon their application. The Act of Congress, approved August 5, 1909, c. 6, § 38, 36 Stat. 112, and the Act approved October 3, 1913, c. 16, subd. G(a), 38 Stat. 172, expressly exempt labor unions from excise taxes. Periodical publications issued by or under the auspices of trade unions are admitted into the mails as second-class mail matter. Act of 1912, c. 389, 37 Stat. 550. The legality of labor unions of postal employees is expressly recognized by Act of Congress, approved August 24, 1912, c. 389, § 6, 37 Stat. 539, 555. By Act of Congress, passed August 1, 1914, no money was to be used from funds therein appropriated to prosecute unions under the Anti-Trust Act (c. 223, 38 Stat. 609, 652).

In this state of federal legislation, we think that such organizations are suable in the federal courts for their acts, and that funds accumulated to be expended in conducting strikes are subject to execution in suits for torts committed by such unions in strikes. The fact that the Supreme Court of Arkansas has since taken a different view in *Baskins* v. *United Mine Workers of America, supra,* can not under the Conformity Act operate as a limitation on the federal procedure in this regard.

Our conclusion as to the suability of the defendants is confirmed in the case at bar by the words of §§ 7 and 8 of the Anti-Trust Law. The persons who may be sued under § 7 include " corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country " [§ 8]. This language is very broad, and the words given their natural signification certainly include labor unions like these. They are, as has been abundantly shown, associations existing under the laws of the United States, of the Territories thereof, and of the States of the Union. Congress was passing drastic legislation to remedy a threatening danger to the public welfare, and did not intend that any persons or combinations of persons should escape its application. Their thought was especially directed against business associations and combinations that were unincorporated to do the things forbidden by the act, but they used language broad enough to include all associations which might violate its provisions recognized by the statutes of the United States or the States or the Territories, or foreign countries as lawfully existing; and this, of course, includes labor unions, as the legislation referred to shows. Thus it was that in the cases of *United States* v. *Trans-Missouri Freight Association,* 166 U. S. 290, *United States* v. *Joint Traffic Association,* 171 U. S. 505, *Montague & Co.* v. *Lowry,* 193 U. S. 38, and *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, unincorporated associations were made parties to suits in the federal courts under the Anti-Trust Act without question by anyone as to the correctness of the procedure.

For these reasons, we conclude that the International Union, the District No. 21 and the twenty-seven Local Unions were properly made parties defendant here and properly served by process on their principal officers.

Third. The next question is whether the International Union was shown by any substantial evidence to have initiated, participated in or ratified the interference with plaintiffs' business which began April 6, 1914, and continued at intervals until July 17, when the matter culminated in a battle and the destruction of the Bache-Denman properties. The strike was a local strike declared by the president and officers of the District Organization No. 21, embracing Arkansas, Oklahoma and Texas. By Art. XVI of the International constitution, as we have seen, it could not thus engage in a strike if it involved all or a major part of its district members without sanction of the International Board. There is nothing to show that the International Board ever authorized it, took any part in preparation for it or in its maintenance. Nor did they or their organization ratify it by paying any of the expenses. It came exactly within the definition of a local strike in the constitutions of both the National and the District organizations. The District made the preparations and paid the bills. It does appear that the president of the National body was in Kansas City and heard of the trouble which had taken place on April 6 at Prairie Creek and that at a meeting of the International Board he reported it as something he had learned on his trip for their official information. He said that a man named Bache had demanded in a suit an accounting of the funds of the Southwestern Coal Operators' Association, that when he secured the information, he " went down to Arkansas and started to run his mine non-union. The boys simply marched in on him in a day down there and kicked his Colorado guards out of there and broke their jaws and put the flag of the United Mine Workers on top of the tipple and pulled the fires out of the boilers, and that was all there was to it, and the mines have been idle ever since. I do not say our boys did this, but I mean the people from all through that country marched in and

stopped the work, and when the guards offered resistance, several of them were roughly handled but no lives were lost as I understand it." Later in May he made a long speech at a special convention of District No. 21 held at Fort Smith for a purpose not connected with this matter in which he referred especially to the Colorado and West Virginia strikes in which the International Union was engaged with all its might, but he made no specific allusion to the Prairie Creek difficulty. It does appear that in 1916, after Stewart, the president of District No. 21, had been convicted of conspiracy to defeat the injunction issued to protect the Prairie Creek mines in this conflict, and had gone to the penitentiary and was pardoned, White, the national president, wrote a letter thanking the President for this, and that subsequently he appointed Stewart to a position on a District committee. It would be going very far to consider such acts of the president alone a ratification by the International Board creating liability for a past tort. The president had not authority to order or ratify a local strike. Only the Board could do this. White's report in an executive meeting of the Board of the riot of April 6 shows sympathy with its purpose and a lack of respect for law but does not imply or prove on his part any prior initiation or indicate a desire to ratify the transaction as his work. The Board took no action on his report. He did not request it.

Communications from outsiders and editorials published in the United Mine Workers' journal giving accounts of the occurrences at Prairie Creek and representing that the troubles were due to the aggression of the armed guards of the mine owners and that the action of the union men was justified because in defense of their homes against night attacks, do not constitute such ratification by the Board or the president after the fact as to make the International Union liable for what had been done.

The argument of counsel for the plaintiffs is that because the National body had authority to discipline District organizations, to make local strikes its own and to pay their cost, if it deemed it wise, the duty was thrust on it when it knew a local strike was on, to superintend it and prevent its becoming lawless at its peril. We do not conceive that such responsibility is imposed on the National body. A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of the corporation. But it must be shown that it is in the business of the corporation. Surely no stricter rule can be enforced against an unincorporated organization like this. Here it is not a question of contract or of holding out an appearance of authority on which some third person acts. It is a mere question of actual agency which the constitutions of the two bodies settle conclusively. If the International body had interfered or if it had assumed liability by ratification, different questions would have arisen.

Counsel cite § 2 of Art. XII of the constitution of District No. 21 to show that questions of all strikes must be referred by District officers to the National president for his decision, and suggest that in the absence of a showing it is to be inferred that they did so here and the strike was approved by him. They misconstrue the section. It applies only to a proposed strike which would affect two Districts and to which one District is opposed. It does not apply to local strikes like this.

But it is said that the District was doing the work of the International and carrying out its policies and this circumstance makes the former an agent. We can not agree to this in the face of the specific stipulation between them that in such a case unless the International expressly assumed responsibility, the District must meet it alone. The subsequent events showing that the District did meet

the responsibility with its own funds confirm our reliance upon the constitution of the two bodies.

We conclude that the motions of the International Union, the United Mine Workers of America, and of its president and its other officers, that the jury be directed to return a verdict for them, should have been granted.

Fourth. The next question is twofold: (a) Whether the District No. 21 and the individual defendants participated in a plot unlawfully to deprive the plaintiffs of their employees by intimidation and violence and in the course of it destroyed their properties, and, (b), whether they did these things in pursuance of a conspiracy to restrain and monopolize interstate commerce.

The case made for the plaintiff was as follows:

(a) In March of 1914, when the Prairie Creek No. 4, Mammoth Vein Coal Mine, and the Coronado mines were operating with union labor and under a District No. 21 contract and scale of wages and terms which did not expire until July 1 following, Bache, the manager of all the properties, determined to run his mines thereafter on a non-union or open basis. He had his superintendent prepare a letter setting forth his reasons for the change and forwarded it to his principals in the East to justify the change of policy which he insisted would result in a substantial reduction in the cost of production. To avoid the charge of a breach of the union scale, he had a contract made between the Mammoth Vein Coal Mining Company, which he controlled, and the Prairie Creek Coal Company and the Mammoth Vein Coal Company, by which the Mammoth Vein Coal Mining Company, a corporation with $100 capital, agreed to run the mines. As it had signed no scale, he considered it free from obligation to the union. He then shut down the mines and prepared to open them on a non-union basis on April 6. He anticipated trouble. He employed three guards from the Burns Detective Agency, and a number of others to aid them. He bought

a number of Winchester rifles and ammunition.   He sur-
rounded his principal mining plant at Prairie Creek No. 4
with a cable strung on posts.   He had notices prepared
for his former employees, who occupied the Company's
houses, to vacate.   He had notices warning trespassers
from the premises posted at the entrance to the tract that
was enclosed within the cable.   He sent out for non-union
men and had gathered some thirty or more at the mine
by the day fixed for the opening.
    The mines of the plaintiffs lie in the County of Sebas-
tian on the west border of Arkansas, next to Oklahoma, in
a hilly country.   The whole country is full of coal mines.
The annual coal-producing capacity of Arkansas is about
2,000,000 tons.   The product is a smokeless coal like the
Pocahontas of West Virginia.   All the Arkansas mines but
one small one were union.   The towns in the neighbor-
hood, Hartford, Huntington, Midland, Frogtown, and
others were peopled by union miners and the business
done in them was dependent on union miners' patronage.
Hartford, a town of twenty-five hundred, was about three
miles from Prairie Creek, Midland, less in size, lay about
the same distance away in another direction, and Hunting-
ton was a mile or two further in still another direction.
Frogtown was a small village about a mile and a half from
Prairie Creek.   Stewart, the president of the District No.
21, and the other officers promptly declared a local strike
against the Prairie Creek and Mammoth Vein mine and
the union miners who had not been discharged from the
Coronado mine of the plaintiffs left.   Through the agency
of the officers of District No. 21 and the local unions, a
public meeting was called at the school house, about a
quarter of a mile from the Prairie Creek mine.   The influ-
ence of the union men was exerted upon the shopkeepers
of the towns above named to close their stores and attend
the meeting.   It was given a picnic character and women
and children attended.   The meeting, after listening to

speeches, appointed a committee to visit the superinten-
dent in charge of the mine. On this committee was one
Slankard, a constable of the town of Hartford, and a union
man, together with two other union miners. They asked
the superintendent that the non-union men be sent away
and the mine resume operations with union men. The
committee was attended by a very large body of union
miners. They were met at the entrance to the enclosure
by two guards with guns carried behind them. The com-
mittee was admitted to see the superintendent and the
crowd dealt with the guards. The guards had been di-
rected not to use their guns save to defend their own lives
or another's. The union miners assaulted the guards, took
the guns away, and so injured a number of the employees,
that four or five had to be sent to a hospital. The crowd
swarmed over the premises, forced the pulling of the fires
and hurled stones at the fleeing guards. The result was
that all the employees deserted the mine, and it was com-
pletely filled with water which came in when the pumps
stopped. One of the crowd went up to the top of the coal
tipple and planted a flag on which was the legend, "This is
a union man's country."

Mr. Bache, after the riot and lawless violence of April
6, secured from the Federal District Court an injunction
against those union miners and others whom his agents
could identify as having been present and having taken
part. This included the president and secretary-treasurer
of the District No. 21 and others. Bache then made
preparations to resume mining. The mine was full of
water and it required a considerable time to pump it out
and get things into proper condition. Because of further
threats, the court was applied to to send United States
Deputy Marshals to guard the property, and they were
sent. Meantime the work of reparation progressed, and
Bache's agents were engaged in securing the coming of
miners and other employees from in and out of the State

to enlarge his force. The attitude of the union miners continued hostile, and constant effort was made by them to intercept the groups of men and women who were brought in by Bache from Tennessee and elsewhere, and to turn them away either by peaceable inducement or by threats and physical intimidation. The vicinage was so permeated with union feeling that the public officers did not hesitate to manifest their enmity toward the non-union men, and made arrests of the guards and others who were in Bache's employ upon frivolous charges. Rumors were spread abroad through the county that the guards employed by Bache were insulting and making indecent proposals to very young girls in and about Prairie Creek, and P. R. Stewart, the president of District No. 21, in the presence of some ten persons on the public street of Midland, in the latter part of May, denounced the guards for these insults and proposals, and said that he would furnish the guns if the people would take them. The evidence also disclosed that through the secretary-treasurer of District No. 21, some forty or more rifles were bought from the Remington Arms Company and secretly sent to Hartford for the purpose intended by Stewart. They were paid for by a check signed by Holt, the secretary-treasurer of District No. 21, and counter-signed by Stewart, the president. Conversations with Stewart, which Stewart did not take the stand to deny, were sworn to, in which he announced that he would not permit the Prairie Creek mine to run " non-union " and intended to stop it. McLachlin, who was a member of the Executive Board of District No. 21, in the first week of July gathered up some of the guns, exactly how many does not appear, and shipped them sixty miles to Mc-Alester, Oklahoma, the headquarters of District No. 21. It appeared that guns of like make and caliber were used by the assailants in the attack on the Prairie Creek mine on July 17. The United States marshals had been with-

drawn from the premises of Prairie Creek Mine No. 4, before July 1, though the guards were retained.

The evidence leaves no doubt that during the month of June there was a plan and movement among the union miners to make an attack upon Prairie Creek Mine No. 4. By this time the number of men secured by Bache had increased to seventy or eighty, and preparations were rapidly going on for a resumption of mining. The tense feeling in respect to the coming attack increased. On Sunday night, July 12, about midnight, there was a fusillade of shots into the village of Frogtown, a small collection of houses, already mentioned, about a mile and a half from Prairie Creek mine. A number of people in fright at the cry that "the scabs were surrounding the town" left and went to Hartford, about two miles away, and thereafter guards were put out at Hartford to defend that town against attack by the guards at Prairie Creek. The ridiculous improbability that the guards at Prairie Creek who were engaged in protecting themselves and the property and in constant fear of attack should make this unprovoked assault upon the town of Frogtown, is manifest from the slightest reading of the evidence, and there crept in through a statement of one of the defendants, an active union man, to a witness who testified to it, that this shooting had been done by the Hartford constable Slankard, and himself, in order to arouse the hostility of the neighborhood against the men at Prairie Creek. On the night of the 16th, the union miners' families who lived in Prairie Creek were warned by friends to leave that vicinity in order to avoid danger, and at 4 o'clock the next morning the attack was begun by a volley of many shots fired into the premises. A large force with guns attacked the mining premises from all sides later on in the day.

The first movement toward destruction of property was at Mine No. 3, a short distance from No. 4, where the coal washhouse was set on fire. The occupants of the prem-

ises were driven out except a few who stayed and entrenched themselves behind coal cars or other protection. Most of the employees and their families fled to the ridges behind which they were able to escape danger from the flying bullets. The forces surrounding the mine were so numerous that by one o'clock they had driven out practically all of the defenders and set fire to the coal tipple of Mine No. 4, and destroyed all the plant by the use of dynamite and the match.

The assailants took some of Bache's employees prisoners as they were escaping, and conducted them to a log cabin behind the school house near the mine to which reference has already been made, and where the first riot meeting was held. The four or five prisoners were taken out of the cabin where they had been for a short time confined, and two of them, one a former union man, were deliberately murdered in the presence of their captors, by a man whose identity it was impossible to establish. The evidence in this case clearly shows that Slankard, the constable of Hartford, was present at the killing, and that the men who were killed were in his custody on the way, as he said, to the grand jury. He was subsequently tried before a Sebastian County jury for murder, and was acquitted on an alibi. Slankard, though a defendant and in court, did not take the stand in this case. The overwhelming weight of the evidence establishes that this was purely a union attack, under the guidance of District officers.

The testimony offered by defendants to show that it was only an uprising of the indignant citizens of the countryside really tended to confirm the guilt of the District No. 21. Its palpably artificial character showed that basis for it had been framed in advance for the purpose of relieving the officers of District No. 21 and the union miners of that neighborhood from responsibility for the contemplated execution of their destructive and criminal purpose. It is a doubtful question whether this responsibility

was not so clearly established that, had that been the
only element needed to justify a verdict, the court prop-
erly might have directed it. The president of District
No. 21 and the union miners, including Slankard, whose
agency in and leadership of this attack were fully proven,
were present in the courtroom at the trial, but did not
take the stand to deny the facts established. Indeed
they had been previously brought to trial for conspiracy
to defeat the federal administration of justice and for
contempt because of these very acts, had pleaded guilty
to the charges made, and had been sentenced to imprison-
ment, and their expenses as defendants in and out of jail
had been paid by the District out of the District treasury
and the disbursements approved by the District in con-
vention.

It is contended on behalf of District No. 21 and the
local unions that only those members of these bodies
whom the evidence shows to have participated in the
torts can be held civilly liable for the damages. There
was evidence to connect all these individual defendants
with the acts which were done, and, in view of our finding
that District No. 21 and the unions are suable, we can
not yield to the argument that it would be necessary to
show the guilt of every member of District No. 21 and of
each union in order to hold the union and its strike funds
to answer. District No. 21 and the local unions were en-
gaged in a work in which the strike was one of the chief
instrumentalities for accomplishing the purpose for which
their unions were organized. By § 1 of Art. XII of the
constitution of District No. 21, it is provided that:

"When trouble of a local character arises between the
members of local unions and their employer, the mine
committee and officers shall endeavor to effect an ami-
cable adjustment, and failing they shall immediately
notify the officers of the district and said district officers
shall immediately investigate the cause of the complaint,

and failing to effect a peaceful settlement upon a basis that would be equitable and just to the aggrieved members, finding that a strike would best subserve the interests of the locality affected, they may with the consent and approval of the district officers, order a strike."

Thus the authority is put by all the members of the District No. 21 in their officers to order a strike, and if in the conduct of that strike unlawful injuries are inflicted, the District organization is responsible and the fund accumulated for strike purposes may be subjected to the payment of any judgment which is recovered.

(b) It was necessary, however, in order to hold District No. 21 liable in this suit under the Anti-Trust Act, to establish that this conspiracy to attack the Bache-Denman mines and stop the non-union employment there, was with intent to restrain interstate commerce and to monopolize the same, and to subject it to the control of the union. The evidence upon which the plaintiffs relied to establish this and upon which the judgment of the trial court and of the Court of Appeals went, consisted of a history of the relations between the International Union and the union coal operators of certain so-called competitive districts from 1898 until 1914. The miners of Ohio, Indiana and Illinois, large bituminous coal producing States, were members of the union and the coal operators of those States, in spite of strikes and lockouts from time to time, were properly classed as union operators. They met yearly in conference with the union's representatives to agree upon terms of employment from April 1st to April 1st. In these conferences the operators frequently complained that the competition of many non-union mines in Western Pennsylvania and the whole of West Virginia was ruinous to their business because of the low cost of production of coal in such mines due to the lower wages and less expensive conditions of working than

in union mines, and urged that something must be done to stop this, or that the union scale of wages be reduced. By section 8 of the contract between the operators of the Central Competitive Coal Field and the United Mine Workers of America, dated Chicago, January 28, 1898, it was stipulated " That the United Mine Workers' organization, a party to this contract, do hereby further agree to afford all possible protection to the trade and to other parties hereto against any unfair competition resulting from a failure to maintain scale rates."

From this time on in every annual conference until after the controversy in the case before us in 1914, the subject recurred. It does not appear when, if at any time, wages were reduced because of this plea by the operators. Sometimes the contention of the operators as to the effect of non-union competition was conceded and greater activity in unionizing non-union territory was promised. Again pleas were made by the miners' representatives of the great amount of money expended by the union and, in one or two instances, of the sacrifice of human lives to effect this result. Again the union leaders flatly refused to be further affected by the argument and charged that the non-union competition of West Virginia, which was always the principal factor, was only possible because some of the most important union operators in Ohio and the central competitive field really were interested as non-union operators in West Virginia. There was considerable discussion as to the non-union competition of Kentucky fields as a basis for the operators' complaints. At times, there were suggestions from the miners' side that the operators ought to contribute funds to enable the campaign of unionizing to go on, but they never seem to have met with favor.

In general convention of the union of 1904, a local union from the Indian Territory in District No. 21 submitted a resolution which was adopted in respect to the then Colorado strike:

" Resolved, That in strict compliance with our obligations and teachings, we accord a hearty approval to our National Board on its action in regard to District No. 15 strike, now on, in Colorado, and whatever action taken by the National that in their judgment is necessary to the successful ending in the elevating of the craft in District No. 15, meets our entire approval, for which we pledge our unqualified support, as our knowledge of the field of southern Colorado in the event of an unsuccessful issue of the trouble now pending would work almost unsurmountable and incalculable damage to District No. 21, as it would be an unjust competition in the same commercial field and could with very little effort undersell and supersede us in the Oklahoma and southwestern Kansas markets."

In a joint conference between the union leaders and the coal operators, in 1904, Mr. Mitchell, the president of the union, spoke as follows:

" I believe the discussion of this matter should be carried on with perfect frankness and candor on both sides. I don't think we should disguise our position at all; and I want to state for our side of the house just where we are, as I understand it. We don't believe that a reduction in the mining rate will help you. We know that it will do us incalculable injury. We don't believe that a reduction in the mining rate will secure for you a larger amount of trade than you now have. We don't believe that the industry will be benefited by reducing wages. We know that in the past every reduction in wages has been given to the large consumers of coal—not to the domestic trade, not to those who can ill afford to pay high rates for coal, but to the railroad companies and the great manufacturers. We know that when the mining rate is lowest your profits have been least.

" Now, gentlemen, it has required many many years of work and effort and sacrifice to make wages at the

mines compare favorably with wages in other industries. We are not going back to the old conditions; we are not going to consent to a reduction in wages. We believe the best thing to do is to renew our present wage scale; to make such modifications of internal questions as seem right, and then return and work out the coming scale year as we have the past scale year. I think we may as well understand now as at any other time that we are not going to consent to a reduced mining rate."

At the convention in 1906, a resolution that Districts 13, 14, 21, 24 and 25, be admitted to the interstate joint conferences, was adopted. This was urged by President Mitchell of the Union, and the Secretary, W. B. Wilson. The latter said:

" If I understand the principle upon which this movement is based, it is to bring into the joint conference those operators and those miners [of the Southwestern District] whose competitive business is closely related to each other; and in asking that the operators and miners of the Southwestern District be admitted to this conference, we are simply carrying out that principle. The coal mined in Western Pennsylvania comes in immediate and direct competition with Ohio; that mined in Ohio, as well as that in Pennsylvania, comes in competition with Indiana and Illinois; that mined in Illinois comes in competition with Iowa; that mined in Iowa comes in competition with Missouri, and coal mined in Missouri comes in competition with Kansas, Arkansas and the Indian Territory. They are all related to one another; they are all competitors with one another, and it is but just and fair that each of these fields should have a representation in the joint conference that sets a base for the prices of the ensuing year. This is the first conference that is held. Whatever wages are agreed upon here, whether it is an increase in wages, a decrease in wages, improved conditions or otherwise, it sets the pace for other districts, and those

other districts have no voice in saying what that price shall be. In order to avoid that condition of affairs, in order to give justice to the operators and miners in other fields not represented here at the present time, we ask you, as a matter of fairness and justice, to permit those whose operators and miners are represented here, to participate in this joint conference."

In 1910, Bache, as a union operator, took part for his mines in fixing the scale of wages in District No. 21. Later on, at the time of a conference, he made a separate scale with the District No. 21 more favorable in some respects than that subsequently agreed on in the conference with the other operators, and he was for that reason expelled from the operators' association. He was permitted at a later time to rejoin it, but he had some litigation with it in respect to their funds, the nature of which is not disclosed by the record.

In 1913 and 1914, and in the years preceding, the International Union had carried on two strikes of great extent covering the Colorado fields, and the Ohio and West Virginia fields, in which very large sums of money had been expended and there was much lawlessness and violence. Its treasury had been drained and it borrowed $75,000 from District No. 21 during this period.

The foregoing will enable one to acquire a fair idea of the national situation, shown by the record, in respect to the mining and sale of coal so far as it bears upon this case and upon this state of fact. The plaintiffs charge that there has been and is a continuously operating conspiracy between union coal operators and the International Union to restrain interstate commerce in coal and to monopolize it, and that the work of District No. 21 at Prairie Creek was a step in that conspiracy for which it can be held liable under the Anti-Trust Act.

Coal mining is not interstate commerce, and the power of Congress does not extend to its regulation as such. In

*Hammer* v. *Dagenhart,* 247 U. S. 251, 272, we said: "The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped or used in interstate commerce, make their production a part thereof. *Delaware, Lackawanna & Western R. R. Co.* v. *Yurkonis,* 238 U. S. 439." Obstruction to coal mining is not a direct obstruction to interstate commerce in coal, although it, of course, may affect it by reducing the amount of coal to be carried in that commerce. We have had occasion to consider the principles governing the validity of congressional restraint of such indirect obstructions to interstate commerce in *Swift & Co.* v. *United States,* 196 U. S. 375; *United States* v. *Patten,* 226 U. S. 525; *United States* v. *Ferger,* 250 U. S. 199; *Railroad Commission of Wisconsin* v. *Chicago, Burlington & Quincy R. R. Co.,* 257 U. S. 563; and *Stafford* v. *Wallace,* 258 U. S. 495. It is clear from these cases that if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint. Again, it has the power to punish conspiracies in which such practices are part of the plan, to hinder, restrain or monopolize interstate commerce. But in the latter case, the intent to injure, obstruct or restrain interstate commerce must appear as an obvious consequence of what is to be done, or be shown by direct evidence or other circumstances.

What really is shown by the evidence in the case at bar, drawn from discussions and resolutions of conventions and conference, is the stimulation of union leaders to press their unionization of non-union mines not only as a direct means of bettering the conditions and wages of their workers, but also as a means of lessening interstate competition for union operators which in turn would lessen the pressure of those operators for reduction of the union scale or their resistance to an increase. The latter is a

secondary or ancillary motive whose actuating force in a given case necessarily is dependent on the particular circumstances to which it is sought to make it applicable. If unlawful means had here been used by the National body to unionize mines whose product was important, actually or potentially, in affecting prices in interstate commerce, the evidence in question would clearly tend to show that that body was guilty of an actionable conspiracy under the Anti-Trust Act. This principle is involved in the decision of the case of *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229, and is restated in *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184. . But it is not a permissible interpretation of the evidence in question that it tends to show that the motive indicated thereby actuates every lawless strike of a local and sporadic character, not initiated by the National body but by one of its subordinate subdivisions. The very fact that local strikes are provided for in the union's constitution, and so may not engage the energies or funds of the National body, confirms this view. Such a local case of a lawless strike must stand on its own facts and while these conventions and discussions may reveal a general policy, the circumstances or direct evidence should supply the link between them and the local situation to make an unlawful local strike, not initiated or financed by the main organization, a step in an actionable conspiracy to restrain the freedom of interstate commerce which the Anti-Trust Act was intended to protect.

This case is very different from *Loewe* v. *Lawlor,* 208 U. S. 274. There the gist of the charge held to be a violation of the Anti-Trust Act was the effort of the defendants, members of a trades union, by a boycott against a manufacturer of hats to destroy his interstate sales in hats. The direct object of attack was interstate commerce.

So, too, it differs from *Eastern States Retail Lumber Dealers' Association* v. *United States,* 234 U. S. 600, where

the interstate retail trade of wholesale lumber men with consumers was restrained by a combination of retail dealers by an agreement among the latter to blacklist or boycott any wholesaler engaged in such retail trade. It was the commerce itself which was the object of the conspiracy. In *United States* v. *Patten,* 226 U. S. 525, running a corner in cotton in New York City by which the defendants were conspiring to obtain control of the available supply and to enhance the price to all buyers in every market of the country was held to be a conspiracy to restrain interstate trade because cotton was the subject of interstate trade and such control would directly and materially impede and burden the due course of trade among the States and inflict upon the public the injuries which the Anti-Trust Act was designed to prevent. Although running the corner was not interstate commerce, the necessary effect of the control of the available supply would be to obstruct and restrain interstate commerce and so the conspirators were charged with the intent to restrain. The difference between the *Patten Case* and that of *Ware & Leland* v. *Mobile County,* 209 U. S. 405, illustrates a distinction to be drawn in cases which do not involve interstate commerce intrinsically but which may or may not be regarded as affecting interstate commerce so directly as to be within the federal regulatory power. In the *Ware & Leland Case,* the question was whether a State could tax the business of a broker dealing in contracts for the future delivery of cotton where there was no obligation to ship from one State to another. The tax was sustained and dealing in cotton futures was held not to be interstate commerce, and yet thereafter such dealings in cotton futures as were alleged in the *Patten Case* where they were part of a conspiracy to bring the entire cotton trade within its influence, were held to be in restraint of interstate commerce. And so in the case at bar, coal mining is not interstate commerce and obstruc-

tion of coal mining, though it may prevent coal from going into interstate commerce, is not a restraint of that commerce unless the obstruction to mining is intended to restrain commerce in it or has necessarily such a direct, material and substantial effect to restrain it that the intent reasonably must be inferred.

In the case at bar, there is nothing in the circumstances or the declarations of the parties to indicate that Stewart, the president of District No. 21, or Hull, its secretary-treasurer, or any of their accomplices had in mind interference with interstate commerce or competition when they entered upon their unlawful combination to break up Bache's plan to carry on his mines with non-union men. The circumstances were ample to supply a full local motive for the conspiracy. Stewart said: " We are not going to let them dig coal—the scabs." His attention and that of his men was fastened on the presence of non-union men in the mines in that local community. The circumstance that a car loaded with coal and billed to a town in Louisiana was burned by the conspirators has no significance upon this head. The car had been used in the battle by some of Bache's men for defense. It offered protection and its burning was only a part of the general destruction.

Bache's breach of his contract with the District No. 21 in employing non-union men three months before it expired, his attempt to evade his obligation by a manipulation of his numerous corporations, his advertised anticipation of trespass and violence by warning notices, by enclosing his mining premises with a cable and stationing guards with guns to defend them, all these in the heart of a territory that had been completely unionized for years, were calculated to arouse a bitterness of spirit entirely local among the union miners against a policy that brought in strangers and excluded themselves or their union colleagues from the houses they had occupied and

the wages they had enjoyed. In the letter which Bache dictated in favor of operating the mines on a non-union basis, he said, " To do this means a bitter fight but in my opinion it can be accomplished by proper organization." Bache also testified that he was entering into a matter he knew was perilous and dangerous to his companies because in that section there was only one other mine running on a non-union basis. Nothing of this is recited to justify in the slightest the lawlessness and outrages committed, but only to point out that as it was a local strike within the meaning of the International and District constitutions, so it was in fact a local strike, local in its origin and motive, local in its waging, and local in its felonious and murderous ending.

But it is said that these District officers and their lieutenants among the miners must be charged with an intention to do what would be the natural result of their own acts, that they must have known that obstruction to mining coal in the Bache-Denman mines would keep 75 per cent. of their output from being shipped out of the State into interstate competition, and to that extent would help union operators in their competition for business. In a national production of from ten to fifteen million tons a week, or in a production in District No. 21 of 150,000 tons a week, 5,000 tons a week which the Bache-Denman mines in most prosperous times could not exceed, would have no appreciable effect upon the price of coal or non-union competition. The saving in the price per ton of coal under non-union conditions was said by plaintiffs' witnesses to be from seventeen to twenty cents, but surely no one would say that such saving on 5,000 tons would have a substantial effect on prices of coal in interstate commerce. Nor could it be inferred that Bache intended to cut the price of coal. His purpose was probably to pocket the profit that such a reduction made possible. If it be said that what District No. 21 feared

was that, if Bache were successful, the defection among union operators would spread and ultimately the whole District field of District No. 21 in Arkansas, Oklahoma and Texas would become non-union, and interstate commerce would then be substantially affected, it may be answered that this is remote and no statement or circumstance appears in the record from which it can be inferred that the participants in the local strike had such a possibility in mind or thought they were thus protecting union operators in a control or monopoly of interstate commerce. The result of our consideration of the entire record is that there was no evidence submitted to the jury upon which they properly could find that the outrages, felonies and murders of District No. 21 and its companions in crime were committed by them in a conspiracy to restrain or monopolize interstate commerce. The motion to direct the jury to return a verdict for the defendants should have been granted.

Fifth. These conclusions make it unnecessary to examine the objection which the plaintiffs in error make to the supplemental charge of the court.

The case has been prepared by counsel for the plaintiffs with rare assiduity and ability. The circumstances are such as to awaken regret that, in our view of the federal jurisdiction, we can not affirm the judgment. But it is of far higher importance that we should preserve inviolate the fundamental limitations in respect to the federal jurisdiction.

*The judgment is reversed, and the case remanded to the District Court for further proceedings in conformity to this opinion.*