COUNTY ASSESSOR, OKLAHOMA COUNTY, et al. v. UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, LOCAL NO. 329.

No. 33532. Nov. 8, 1949.

*211 P. 2d 790.*

Warren H. Edwards, County Atty., and Fred L. Hoyt, Asst. County Atty., both of Oklahoma City, for plaintiffs in error.

W. K. Garnett and Chas. H. Garnett, both of Oklahoma City, for defendant in error.

GIBSON, J. United Brotherhood of Carpenters and Joiners of America, Local No. 329, instituted this action by filing before the board of equalization of Oklahoma county a protest to the action of the board in assessing and placing upon the tax rolls certain lots owned by it, with the improvements thereon. It is averred in the protest that the assessment is unlawful because the real estate is used solely by and for the benefit of the members of the Union, which is a voluntary nonprofit association of laborers, the purposes of which are educational, charitable, benevolent, scientific and fraternal, and that by reason thereof said land is exempt from taxes under the Constitution and statutes of the state. The protest was denied and the Union appealed to the district court of Oklahoma county and there it was tried. The court found the issues generally for the appellant and awarded judgment vacating the action of the equalization board. Therefrom this appeal is prosecuted. The parties to the appeal will be referred to as County and Union, respectively.

The sole question for review is whether the property is exempt from taxation. And since the facts are not in dispute the question is one of law.

· The grounds urged by the County for reversal are presented under the general proposition that the property is not exempt under the provisions of the Constitution and statutes. The force of such contention can be better considered in connection with the grounds urged by the Union to sustain the judgment which are stated more specifically and are that the Union's property was used for (1) a charitable purpose; (2) an educational purpose; and (3) a benevolent purpose.

The Union is a local branch of the national organization of the same name, hereinafter referred to as Brotherhood, to which it is subordinate. The object of the Brotherhood is thus declared in its Constitution:

"Section 2. The objects of the United Brotherhood are: To discourage piece work, to encourage an apprentice system and a higher standard of skill, to cultivate friendship, to assist each other to secure employment, to reduce the hours of daily labor, to secure adequate pay for our work, to establish a weekly pay day, to furnish aid in cases of death or permanent disability, and by legal and proper means to elevate the moral, intellectual and social conditions of all our members, and to improve the trade."

And therein the Principals of the Brotherhood are, in substance, declared to be:

(1) Earnest support of the objects of the American Federation of Labor.

(2) Making it a rule of members in purchasing to call for goods which bear the mark of organized labor and to give careful consideration to any individual, firm or corporation who strike a blow at organized labor, and declaring "No good union man can kiss the rod that whips him."

(3) Strive to secure legislation favorable to labor.

(4) Endeavor to secure more stringent immigration laws in order to prevent the importation of destitute laborers.

(5) Set a good example as faithful workers reflecting performance of duty to employers and honor to themselves and the organization.

(6) Advocate a reduction in the hours for a day's work as promotive of the

intelligence and happiness of the laborer and the adoption of a Five-Day, Thirty-Hour Work Week.

(7) A recognition that the interests of all classes of labor are identical and, hence, that a wrong done to one is a wrong done to all.

The Brotherhood exercises supervision of and control over all local unions with power to suspend any union when not working in harmony with the constitution and laws of the brotherhood, and to authorize a strike when it is deemed necessary to defend the Union's rights.

The revenue of the Brotherhood is derived and pledged to uses as follows:

"Each beneficial Local union shall pay to the General Secretary $5.00 on eacn new member admitted, excepting apprentices, also Seventy-five (75c) Cents per month for each member in good standing, Forty (40c) Cents of which shall be used as a fund for the general management of the United Brotherhood and payment of all death and disability donations prescribed by the Constitution and Laws of the United Brotherhood, together with all legal demands made upon the United Brotherhood. The balance of Thirty-five (35c) Cents, together with moneys received from new members, to be placed in a special fund for 'home and pension' purposes."

Donations are provided in case of death or total disability of a member, or death of his wife, where at the time thereof the member is in good standing. And for the aged there is maintained a home at Lakeland, Florida.

The Union is organized and its meetings held according to ritual and its revenue is derived from the initiation fees and dues paid by its members. The membership is composed of those who on admission can qualify as carpenters or joiners, or as apprentices. The initiation fee of a carpenter or joiner is $50, and that of an apprentice $10. The dues of the former are $2.50 per month and that of the latter $2 per month. The funds thus arising can be used only for such purposes as are specified in the Constitution and Laws of the Brotherhood and "as may be required to transact and properly conduct its business, viz.: Payment of salaries and donations to sick members; purchasing stationery, books, cards, printing, payment of rent, or any legally authorized bill against the Local Union."

Local unions have the power to regulate and make payment of sick donations but may do so only by an established by-law. The Union has established and maintains a contingent fund for such purpose. Such purpose and the right to share therein is thus declared:

"The purpose of this fund is to help and assist those of our membership who are sick and in need of such help and assistance. This does not mean all members who are sick but only those who are sick and have no means of assistance other than their own earnings. The United Brotherhood is not a charitable institution and it is not the purpose to use this fund for unemployment or loans of any nature, nor to make donations to those who are sick who have any way of getting along from any other source."

The educational work of the Union finds expression in the training of the apprentices. This is accomplished through two methods that are complementary; one, direct instruction by a carpenter member with whom he works, and the other through school instruction. The first is accomplished through agreement between the Union and the employer under which there is to be employed one apprentice for each three carpenter members employed. The apprentice is assigned to one of the carpenters who does the same type of work and can teach him concerning it. The schooling is accomplished through the joint efforts of the Union and the Department of Labor in providing the amount necessary to employ school instructors to give the technical training. The classes are held at night in the Central High School, Oklahoma City, Oklahoma. The teachers

are supplied by the board of education and receive compensation on the basis of $2.50 per hour, of which the Labor Department pays $1 and the Union $1.50.

Touching the main purposes of the Union, W. A. Meyer, business representative and financial secretary of the Union, testified:

"I will say that maintaining a fair standard of living and maintaining a living wage scale, adequate wage scale, is probably the primary part of the work of the organization."

Controlling here is the following portion of section 6 of art. 10 of the Constitution:

"All property used for free public libraries, free museums, public cemeteries, property used exclusively for schools, colleges, and all property used exclusively for religious and charitable purposes, and all property of the United States, and of this State, and of counties and of municipalities of this State; household goods of the heads of families, tools, implements, and livestock employed in the support of the family, not exceeding one hundred dollars in value, and all growing crops, shall be exempt from taxation; Provided, That all property not herein specified now exempt from taxation under the laws of the Territory of Oklahoma, shall be exempt from taxation until otherwise provided by law: . . . ."

The exemptions under the territorial law are enumerated in subdivisions 5 and 6 of section 5914, Wilson's Rev. Statutes Okla. Ter. 1903, which are as follows:

"Fifth. The grounds and buildings of library, scientific, educational, benevolent and religious institutions, colleges or societies, devoted solely to the appropriate objects of these institutions, not exceeding ten acres in extent, and not leased or otherwise used with a view to pecuniary profit.

"Sixth. The books, papers, furniture, scientific or other apparatus pertaining to the above institutions and used solely for the purpose above contemplated, and the like property of students in

any such institutions used for the purpose of their education."

These provisions were re-enacted in 1909 (S. L. 1909, ch. 38) and carried forward into section 12319, O. S. 1931. In 1941 (Tit. 68, S. L. 1941, p. 308) there was enacted a code on revenue and taxation wherein said section 12319 was repealed. The provisions therein relative to charitable, educational and benevolent institutions, now subsections 3, 4, 8 and 9 of section 15.2, Tit. 68, O. S. 1941, are as follows:

"3. All property of any scientific or educational institution, college or society providing such property is devoted exclusively and directly to the appropriate objects of such institution, college or society within this State, provided, however, that any such scientific or educational institution, college or society shall be allowed an exempted valuation not to exceed $2,500.00 on property not used exclusively and directly for scientific or educational purposes within this State.

"4. The books, papers, furniture and scientific or other apparatus pertaining to any institution, college or society referred to in subparagraph 3 of this Section, and devoted exclusively and directly for the purpose above contemplated, and the like property of students in any such institution or college, while such property is used for the purpose of their education.

"8. All property of any benevolent or charitable institution organized or chartered under the laws of this State as a nonprofit or charitable institution providing the net income from such property is used exclusively within this State for charitable purposes and no part of such income inures to the benefit of any private stockholder.

"9. All property used exclusively and directly for charitable purposes within this State providing the charity using said property does not pay any rent or remuneration to the owner thereof."

To the extent there is any variance between the exemptions declared under the last Act and those obtaining upon adoption of the Constitution, the same

must be construed in light of said section 6 of art. 10, and the further provision of section 50 of art. 5 thereof, which is as follows:

"The Legislature shall pass no law exempting any property withis (within) this State from taxation, except as otherwise provided in this Constitution."

Except to the extent the constitutional provision granting exemptions is self-executing (Cox v. Dillingham, Co. Treas., 199 Okla. 161, 184 P. 2d 976), the Legislature is vested with power (sec. 6, art. 10, Const.) to qualify, curtail or annul any exemption from taxation, but it is without power to grant exemptions other than those recognized by the Constitution or to enlarge the exemptions so recognized. Beta Theta Pi Corporation v. Board of Com'rs of Cleveland County, 108 Okla. 78, 234 P. 354.

There is nothing in the 1941 law that alters the conditions previously required of either charitable or educational institutions to entitle them to exemption and it follows that the test in each instance is whether the property in question is used exclusively for the declared purpose of the institution. State v. Alumnae of Tau Beta Chapter of Chi Omega Fraternity, 176 Okla. 186, 55 P. 2d 134.

The provisions of the 1941 law applicable to benevolent institutions (subs. 8, quoted, supra) does not accord fully with the territorial law. But since the Act is ineffective to enlarge the exemption beyond that fixed under the territorial law, the same is to be measured thereby except to the extent, if any, it is curtailed by the 1941 law. Under the territorial law the test corresponds to that applicable to educational institutions and the same is declared as to both in State v. Alumnae of Tau Beta Chapter of Chi Omega Fraternity, supra, in the editorial syllabus, as follows:

"Constitutional proviso exempting from taxation all property not specified which was exempt under territorial laws exempted personalty and realty belonging to scientific, educational and benevolent institutions, colleges, or societies devoted solely to appropriate objects of such institutions and used solely for such purposes (Const. Art. 10, sec. 6)."

That the Union is not entitled to exemption of the property on basis of its being a charitable institution we deem to be too obvious to require discussion. In the first place it is plain the property is not devoted solely to charitable use. And, in the second place, since the use is for the benefit of members only, that fact precludes the idea of use for charity, even though it were wholly benevolent in such respect. In re Farmers' Union Hospital Ass'n of Elk City, 190 Okla. 661, 126 P. 2d 244; Tulsa County et al. v. St. John's Hospital, 200 Okla. 176, 191 P. 2d 983. To like effect, where exemption was claimed by labor unions, see Lane et al. v. Wilson, City Manager of Revenue, 103 Colo. 99, 83 P. 2d 331, and Johnson et al. v. Sparkman et al. (Fla.) 31 So. 2d 863.

In support of the proposition that the property was used for educational purposes, reliance is placed solely upon the holding in Nashville Labor Temple v. City of Nashville, 146 Tenn. 429, 243 S. W. 78, 23 A. L. R. 807. An analysis of the holding therein is contained in the following quotation from Johnson et al. v. Sparkman et al., supra, which involved the same issue as that of the instant case:

"The case most strongly relied upon to support appellants' thesis is Nashville Labor Temple v. City of Nashville, 146 Tenn. 429, 243 S. W. 78, 23 A.L.R. 807. The labor temple held to be exempt in this case was owned by a holding company for the benefit of numerous labor organizations. It was used by them to hold labor meetings, to instruct classes in the trades and crafts. It supported a school for mechanical drawing which was open to the public four nights in the week without charge and the instructors were paid by the Watkins Institute and the Federal Gov-

ernment. Its Auditorium was furnished to the public without charge for the Nashville Symphony Orchestra and for other educational and cultural purposes. Such was the factual set-up upon which the Labor Temple was exempted under the Law of Tennessee, but the Court expressly held that the fact that it dispenses charity to its indigent members and their families would not exempt it from taxation as a charity. By withdrawing the question from the fog of legal pathology and turning on the light of factual analysis the Court could have hardly reached any other conclusion."

In Southwestern Osteopathic Sanitarium v. Davis, Co. Treas., 115 Okla. 296, 242 P. 1033, we said:

"In determining whether property claimed to be used exclusively for educational, scientific, and charitable purposes is exempt from taxation, each case must stand upon its own merits, and the use to which the property is in fact dedicated is the test as to whether such property is exempt from taxation, and such use is a question of fact to be determined from the evidence."

And the need therefor is authoritatively declared in the statute (Tit. 68 O. S. 1941 §3, supra) by the words "providing such property is devoted *exclusively* and *directly* (Italics ours) to the appropriate objects of such institution."

As hereinbefore shown, neither the manual nor technical training of the apprentices was pursued upon the premises involved. The only evidence of educational activity thereon is what is reflected in the weekly meetings there held. On being asked the nature of the discussions at the meetings, witness Meyer, testifying in chief, replied:

"Oh, to bring out various and different things that happened during each week, such things as might help develop trade or bring about better conditions, or to report any sickness or accident to any of the members, and anything that would come under that nature, that affects them, that they want to discuss, and see if they can

better it or assist their own members in means of employment, and so forth."

He was asked if they had speakers from abroad to address the Union, and on his response in the affirmative he was asked the nature of the addresses. His response was as follows:

"Well, they are along the same lines that I just mentioned, that is for the betterment of the trade, and they give us the information of various systems and methods that have proven conditions in other localities, whereby we might improve our labor relations or help our situation here; that might elevate the trade and benefit the membership as a whole."

Considering this evidence, either alone or in connection with the witness' statement of the main purpose of the Union, it is manifest that the educational advantages were not the dominant purposes of the meetings and were incidental and subservient to such purposes. Touching a similar situation, the court, in the Johnson-Sparkman case, supra, said:

"After all is said, the main reason for this instruction is to better the social, economic and political status of appellants' members—certainly a commendable purpose—but the insurance companys, Fuller Brush Salesmen, hardware organizations and many other commercial companies call their employees in at stated intervals and require them to attend a school of instruction to imbibe selling talk and trade techniques to make them more efficient in their line. If appellants' logic is followed to its ultimate conclusion, there would be no end to the organizations that would be here seeking tax exemption on the ground that their property was devoted to an educational purpose.

"So far as the record discloses the use of the property in question for charitable or educational purposes is a mere incident to its main use. To bring it within the constitutional exemption it must be actually occupied and used exclusively for one or both these purposes. The dominant use of the property here shown to be for the benefit

of appellants and to further the interests of its members."

In accord with the view expressed, the Tennessee Court, in State v. Rowan, 171 Tenn. 612, 106 S. W. 2d 861, quoted with approval the following from an earlier case:

". . . 'the mere fact that it administers to charity, or may give instructions of an educational nature along certain lines, does not render it an educational or charitable institution in the sense of our Constitution and statute exempting the property of such institutions from taxation.'"

The Union is not an educational institution in contemplation of the statute.

In support of the contention that the Union is a benevolent institution, there is quoted from 31 Am. Jur. 860, language to the effect that while it has been observed that the purpose of a trade union is to promote the common interests of the members through collective bargaining, the functions of a labor union cover a wide range and that it has been held that the purpose of the latter is generally social and not commercial. In support of the statement in the text as to the purpose of labor unions two cases are cited, Brown v. Stoerkel, 74 Mich. 269, 41 N. W. 921, and Hudson v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 152 Ky. 711, 154 S. W. 47, Anno. Cas. 1915B, 98. And it is urged that, on the basis of the holdings therein, the union's provision for sick benefits to its members and burial expenses of those deceased bring it within the definition of a benevolent institution. The real basis of the decision in each case is that the association or union was not a business entity nor engaged in any business and therefore benevolent and social. The cases are neither pertinent nor persuasive in view of the declared purposes and powers of the union which, in our opinion, give it the character of an entity engaged chiefly in a business enterprise.

In United Mine Workers of America et al. v. Coronado Coal Company et al., 259 U. S. 344, 66 L. Ed. 975, 42 Sup. Ct. 570, 27 A. L. R. 762, it is held in the headnote contained in the Law Edition cited:

"Unincorporated labor unions are comprehended in the provisions of the Sherman Anti-trust Law of July 2, 1890, defining the persons who may be sued under sec. 7 (the treble-damage section) as including 'corporations and associations existing under or authorized by the laws of either the United States or the laws of any of the territories, the laws of any state, or the laws of any foreign country.'"

In Standard Acc. Ins. Co. v. Hoage, Deputy Com'r et al. (C.A.D.C.) 66 Fed. 2d 275, it is held:

"Business agent of labor union, fatally injured in automobile accident while returning from investigation of labor conditions, held 'employee' who sustained injuries 'arising out of and in course of employment' Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C.A. secs. 901-950); D. C. Code 1929, T. 19, secs. 11, 12 (33 U.S.C.A. sec. 901 note)."

The business agent was employed as such by Lathers' International Union, Local No. 9. Involved was an award against the union. The opinion, after holding that the union was a legal entity and subject to suit as such on authority of an U. S. Supreme Court case, declared:

"It may enter into business contracts of various kinds as an 'association.' Its purposes relate to the trade and business of wood and metal lathing. Its function is to aid in the carrying on of this trade by its members, who thereby earn their livelihood, by regulating their contracts of employment, securing to them a fair remuneration for their labor, affording them protection against obnoxious rules, unlawful discharge, or other systems of injustice and oppression. This appears from the constitution and by-laws of the union incorporated in the record. These func-

tions constitute the union as an essential part of the employment of its members in the lathing trade. It is no stretch of terms to say that the activities of the union possess the nature of a business and an employment within the sense in which these terms are used by the statute. In the exercise of these functions it was necessary to employ a business agent such as Lindsay to perform the duties which he was engaged in performing at the time of the accident. In 16 Ruling Case Law, sec. 7, p. 421, it is said: 'That the functions of labor unions now cover a wide range is indicated by the fact that in a comparatively recent English statute the term "trade union" has been defined as any combination, whether temporary or permanent, for regulating the relations between workmen and masters, or between workmen and workmen, or between masters and masters, or for imposing restrictive conditions on the conduct of any trade or business. . . . Labor unions frequently fix wage scales and issue notices to employers that the wage scale established by the union is to be the basis of contracts to be made with its members. Workmen have, in some instances, delegated to the labor unions with which they are connected, the right of selecting a superintendent. . . .'

"It is true that it has been said in some cases that the purposes of a labor union are generally social and not commercial, but it is well within common knowledge that labor unions in general perform an active and important function in the carrying on of many trades and occupations. It is no stretch of language therefore to say that such an organization is essentially a business organization."

In Frederick Schmalz, Suing for the Use of Union Hat Makers' Association of Newark, v. Edwin Woolley et al., 57 N. J. Eq. 303, 43 L. R. A. 86, it is said:

"We understand from the bill that the members of the association represented by the complainant are connected together as journeymen hatters; that their skill in this trade, and their muual assistance in profiting by its practice, form the motive and chief aim of their association. This connection is as clearly one for business purposes as is that of members in a partnership, or of stockholders in a corporation. Although it is a comparatively novel species of relationship, it has become an established one, and therefore calls for the application of those general principles of law and equity which are applied to other species of business associations."

The main purpose of the Union being commercial precludes the idea that it is a benevolent institution, and it necessarily follows that the benevolence, if it can be termed such, reflected in the donations, is merely incidental and therefore subordinate. We hold, however, that such donations do not constitute benevolence because being paid only to members in good standing there is exacted a consideration therefor.

In National Council of Knights and Ladies of Security v. Phillips, 63 Kan. 799, 66 P. 1011, it is held:

"An association conducted for the mutual benefit of its members, and for the purpose of providing a fund, by the contribution of stated dues from such members, for the payment of a special amount upon his death to a beneficiary named by him, is not a benevolent association, within the meaning of the laws of the state, entitling property held by it to exemption from taxation."

In dispensing donations under such circumstances, the Union, in contemplation of law, functions as a beneficial association instead of a benevolent one. 7 C. J. 1051, §1.

In view of the conclusions reached, we deem it unnecessary to consider the applicability of the restrictive provisions contained in subsection 8, Tit. 68, O. S. 1941 §15.2, supra.

Judgment reversed.